Ananta M. DASGUPTA,
Plaintiff–Appellant,

v.

UNIVERSITY OF WISCONSIN BOARD
OF REGENTS, et al., Defendants–
Appellees.

No. 96–4152.

United States Court of Appeals,
Seventh Circuit.

Argued May 15, 1997.

Decided Sept. 3, 1997.

Steven J. Schooler (argued), Lawton & Cates, Madison, WI, for Plaintiff–Appellant.

Monica Burkett–Brist (argued), Office of the Attorney General, Wisconsin Department of Justice, Madison, WI, for Defendants–Appellees.

Before POSNER, Chief Judge, and KANNE and EVANS, Circuit Judges.

POSNER, Chief Judge.

A psychology professor at the Eau Claire branch of the University of Wisconsin claims that the university discriminated against him in pay because of his national origin (he is Bangladeshi), in violation of Title VII of the Civil Rights Act of 1964 and (though this need not be discussed separately) 42 U.S.C. § 1983. The district judge granted summary judgment for the defendants.

■ Dr. Dasgupta claims to have been discriminated against on the basis of his national origin (and his membership in the "brown race," a biological novelty—the people of the Indian subcontinent are Caucasians) between 1974, when he was first hired by the Eau Claire branch of the university, and 1987, when the discrimination ceased, only to resume in 1990 and to be repeated in 1994 and 1995. The suit was brought in 1995, and Dasgupta concedes that any of the alleged violations of Title VII that occurred before 1994 are barred by the statute of limitations unless they were continuing violations, that is, violations continuing into the 300–day limitations period. 42 U.S.C. § 2000e5(e)(1); *Koelsch v. Beltone Electronics Corp.*, 46 F.3d 705, 707 (7th Cir.1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445 (7th Cir.1994). He contends that the violations that occurred between 1974 and 1987 continued into the current period.

■ A continuing violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period. *Galloway v. General Motors Service Parts Operations*, 78 F.3d 1164, 1167 (7th Cir.1996); *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 481–82 (3d Cir.1997); *Berry v. Board of Supervisors*, 715 F.2d 971, 981 (5th Cir.1983). The clearest examples involve sexual harassment, where, as we noted in *Galloway v. General Motors Service Parts Operations, supra*, 78 F.3d at 1167, and *Jones v. Merchants National Bank & Trust Co.*, 42 F.3d 1054, 1058 (7th Cir.1994), duration is often necessary to convert what is merely offensive behavior, and therefore not actionable under Title VII, *Baskerville v. Culligan International Co.*, 50 F.3d 428, 431 (7th Cir.1995); *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 534 (7th Cir.1993); *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 620–21 (6th Cir.1986), into an actionable alteration in the plaintiff's working conditions. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986); *Carr v. Allison Gas Turbine Division*, 32 F.3d 1007, 1011 (7th Cir.1994). The violations of Dasgupta's right not to be discriminated against in the workplace that he alleges occurred between 1974 and 1987 were not of this character; they were outright national-origin discrimination in pay and promotion, coupled with the university's failure to take any measures to protect him from gross harassment by other members of the faculty (including, he implausibly asserts, spitting on him) because of his national origin. These alleged violations would have supported a Title VII suit; Dasgupta's failure to bring such a suit

cannot be ascribed to the ambiguous or incomplete nature of the discrimination—to his being the victim of a campaign whose discriminatory character was not apparent at the time.

Dasgupta claims, and in the posture of the case we accept, that as a result of the early discrimination his salary during the limitations period, which is to say since February 1994, was much lower than that of his peers in the psychology department, the reason being simply that he received raises similar to those that his peers received, and since he was starting from a lower base he ended up lower too. But an untimely Title VII suit cannot be revived by pointing to effects within the limitations period of unlawful acts that occurred earlier. *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980); *Webb v. Indiana National Bank,* 931 F.2d 434, 437–38 (7th Cir.1991). That would make employers pay compensation for violations that were no longer actionable and would thus unravel the statute of limitations. It would be like allowing the losing party in a lawsuit to toll the period for appeal by filing a motion for reconsideration eight years after the judgment; Dasgupta filed this suit eight years after the end of the first period of alleged discrimination, which was 1974 to 1987.

■ This is not a case like *Bazemore v. Friday,* 478 U.S. 385, 395–96, 106 S.Ct. 3000, 3006, 92 L.Ed.2d 315 (1986), or *Wagner v. NutraSweet Co.,* 95 F.3d 527, 534 (7th Cir. 1996), where the illegal act is repeated during the limitations period. Any illegal act that takes place in the limitations period is actionable; the limitations bar falls only on earlier acts. A lingering effect of an unlawful act is not itself an unlawful act, however, so it does not revive an already time-barred illegality—a conclusion supported not only by *Ricks* and *Webb* but also by *Ross v. Buckeye Cellulose Corp.,* 980 F.2d 648, 658–59 (11th Cir.1993), and *Gonzalez v. Firestone Tire & Rubber Co.,* 610 F.2d 241, 249 (5th Cir.1980). The line is a fine one, but reasonably distinct. In *Ricks,* the discriminatory act, which occurred outside the limitations period, was the denial of tenure; Ricks's loss of his job, which occurred later, during the limitations

period, was merely an effect of the illegal act—like other faculty denied tenure, he received a terminal one-year appointment—and did not revive it. In *Bazemore* and *Nutra-Sweet,* the plaintiffs alleged that during the limitations period they failed to receive the amount of compensation that the law entitled them to. The fact that this level had been determined before the limitations period meant only that the violation of their rights was predictable. If an employer tells his employee, "I am going to infringe your rights under Title VII at least once every year you work for me," this does not start the statute of limitations running on the future violations, violations that have not yet been committed. This case is at the opposite pole. There were no new violations during the limitations period, but merely a refusal to rectify the consequences of time-barred violations. It is not a violation of Title VII to tell an employee he won't get a raise to bring him up to the salary level that he would have attained had he not been discriminated against at a time so far in the past as to be outside the period during which he could bring a suit seeking relief against that discrimination.

There is another way to look at Dasgupta's suit, but it leads to the same result. There is a pay difference correlated with a national-origin difference, and this might be thought to create a prima facie case of employment discrimination. But, if so, the company has a complete defense: the correlation is due to the company's policy, which is not itself discriminatory, of proportioning raises to existing salary rather than seeking to bring all employees abreast regardless of what their salaries were in the past. The difference in base-level salaries may have been due to discrimination, but if it was discrimination that occurred before the limitations period, as in this case, it is not actionable.

■ We are left with the alleged discrimination in 1994 and 1995, and here we can limit discussion to the points pressed by Dasgupta's lawyer at the oral argument of the appeal. First he claims that a dean's claimed inability when being deposed to remember an incident involving Dasgupta several years earlier is sufficient evidence of the dean's

"mendacity" to create a jury issue as to whether the reason the dean gave for refusing in 1994 to recommend that Dasgupta be promoted to full professor—that in thirty years of teaching Dasgupta had not published even a single article in a professional journal—was phony ("pretextual," as the cases say). Dasgupta *did* get an article accepted for publication in 1994, his first. Yet the dean, when asked whether he had known about this, testified that he could not recall— even though Dasgupta had used the journal's letter of acceptance as the basis for *emphatically* requesting the dean to reconsider his decision, which the dean refused to do although the next year, the article having by then been published, the dean did recommend the promotion.

When context is restored, the appearance of "mendacity" is dissipated. The question was whether the dean recalled knowing that the article had been accepted when he refused Dasgupta the promotion, and of course he did not recall knowing that, because the acceptance letter was received by Dasgupta and shown to the dean later, after the refusal.

■ Second, Dasgupta claims that the dean was influenced in refusing or delaying promotions and salary increases for him by a stereotypical belief, presumably based on the custom of suttee, on well-publicized instances in which husbands have killed their wives in order to appropriate the wife's dowry, and on the significantly greater mortality of female compared to male infants and children in India, that men from the Indian subcontinent are sexist. The only evidence for the claimed influence of this stereotype on the dean is that some female students of Dasgupta's had complained that he was making remarks in class that seemed to approve of wife-beating. The university had investigated and found no basis for taking any disciplinary action (action that might conceivably have infringed Dasgupta's right of free speech), and one of the investigators had ascribed the complaints to "cultural differences," implying we suppose that Dasgupta had acquired his views of women in a foreign culture and this might result in his making remarks offensive to or misunderstood by American students. If anything, the remark about "cultural differences" seems to have been intended to mitigate or condone Dasgupta's behavior, rather than to condemn him on the basis of a belief about the attitudes of his conationals. But however this may be, no connection has been shown between the remark, or anything else having to do with beliefs prevalent in the Indian subcontinent about women, and the dean's decisions concerning Dasgupta's salary and rank. There is no evidence that the dean thought that Dasgupta by reason of his national origin or anything else was a sexual harasser, the complaints having been investigated and dismissed.

■ Last and least, Dasgupta complains that he was treated worse than a non-Bangladeshi professor who like him had in 1994 never published a single article in a professional journal but was nevertheless promoted to full professor. This person taught in the theater department and had produced a dozen plays, which the dean considered appropriate evidence of scholarly productivity for a member of that department. Dasgupta might as well complain about the promotion of the basketball coach for having a winning season, though the coach had never written a scholarly article.

AFFIRMED.