**Wendy L. YOHO, Plaintiff,**

v.

**TECUMSEH PRODUCTS CO., Defendant.**

**No. Civ.A. 98–C–275.**

United States District Court, E.D. Wisconsin.

April 4, 1999.

Randall A. Haak, McCarty, Curry, Wydeven, Peeters & Haak, Kaukauna, WI, for plaintiff.

Susan R. Maisa, Foley & Lardner, Milwaukee, WI, for defendant.

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

REYNOLDS, District Judge.

Plaintiff Wendy L. Yoho, a former employee of defendant Tecumseh Products Co. ("Tecumseh"), alleges that she was subjected to a hostile work environment and constructively discharged in violation of Title VII of the Civil Rights Act of 1964.[1] Before the court is Tecumseh's motion for summary judgment, which the court grants.

### BACKGROUND[2]

Tecumseh operates a plant in New Hol-

---

1. Yoho states that it is her understanding that regardless of the court's ruling on the present motion, this action will proceed to trial on her first cause of action which alleges sexual harassment. (Pl.'s Mar. 3, 1999 Br. at 8 n. 2.) That cause of action, however, is indistinct from her hostile work environment claim.

2. The background facts are taken from the parties' proposed findings of fact. *See* Local Rule 6.05 (E.D.Wis.). When there is no objection to proposed findings of fact, the court accepts them as true. Local Rule 6.05(d). In the background section, undisputed background facts do not contain citations; quoted or disputed facts do. As to disputed facts, the court reviewed the portion of the record cited in support. Any factual statements which are disputed and do not have support in the record were disregarded by the court for purposes of this decision. If a disputed fact proposed by plaintiff is supported by the portion of the record cited, the court, for purposes of deciding this summary judgment motion, accepts the plaintiff's version as true.

stein, Wisconsin.[3] Yoho was hired in August 1994, for an hourly production position at the plant.[4] Yoho was promoted to supervisor in May 1995, and assigned to the second shift on the cam shaft line;[5] Yoho was a supervisor from that time until she quit on August 19, 1996. Yoho's main duty as supervisor was to supervise hourly employees.

Yoho's husband, Gerald Yoho ("Mr. Yoho"), began employment with Tecumseh in September 1994, as an hourly production employee. In June 1995 (while employed at Tecumseh), Mr. Yoho was arrested and charged with sexually molesting his and Yoho's daughter. Mr. Yoho pled guilty (on January 24, 1996), was sentenced (on April 5, 1996), and has been in prison since April 14, 1996.

In June 1995 (the month Mr. Yoho was arrested), a newspaper article was published in the Fond du Lac Reporter regarding Mr. Yoho's arrest.[6] This article appeared at the plant on two occasions within a few days of the date it was published, in at least three places—a clipboard by the cam line,[7] on a metal cabinet on the rod line,[8] and in Yoho's mailbox.

A second article about Mr. Yoho's criminal proceedings appeared in the Fond du Lac Reporter in April 1996.[9] Yoho was only aware of this article being in the workplace on two occasions—on a box of castings within a few days of publication,[10] and the entire newspaper containing the article was in a blueprint drawer in an area of the plant where Yoho did not work, approximately two to three weeks after the article was published. A Tecumseh employee told Yoho that some other employees had been passing the newspaper around, which Yoho never witnessed. Yoho complained to her supervisor about what she saw.

On ten occasions over a period of almost a year (June 1995 to April 1996), Yoho learned of graffiti written inside the stalls of two men's restrooms that made vulgar references to Yoho or her daughter. Employees told Yoho about the graffiti; Yoho only knew about the graffiti because the employees told her about it.[11] On three of

---

3. Neither party describes the nature of Tecumseh's business. The complaint alleges that Tecumseh manufactures compressors and small engines. (Mar. 26, 1998 Compl. ¶ 3.)

4. Neither party specifies the position. The complaint alleges that Yoho was a lathe and drill press operator. (Mar. 26, 1998 Compl. ¶ 9.)

5. Neither party describes the cam shaft line.

6. A copy of the article is attached to the January 28, 1999 Katz affidavit. The article mentions Mr. Yoho by name, and references his alleged sexual assault of an eight-year-old girl, without identifying the girl as his daughter.

7. Within a couple of days after the article came out, a Tecumseh employee handed Yoho the article and told her it was on a clipboard on the cam shaft line. (Yoho does not believe the employee was trying to harass her, but rather wanted to let her know that it was on the cam line (Dec. 1, 1998 Yoho Dep. at 58).) Yoho never saw the article on the clipboard.

8. Neither party describes the rod line. Yoho did not work on the rod line at this time. (Def.'s Jan. 29, 1999 Proposed Finding of Fact ¶ 22.)

Yoho's March 3, 1999 response to Tecumseh's proposed finding of fact ¶ 18 states that the article was posted on a clipboard by the cam line, in Yoho's mailbox, and on the flange line washer. The flange line washer is not described, nor is it referenced in the record citation given in support of Yoho's response. Yoho does not object to Tecumseh's January 29, 1999 proposed finding of fact ¶ 21, which states that the article appeared on a metal cabinet on the cam line and in Yoho's mailbox. Perhaps the flange line washer and the metal cabinet are one and the same, but neither party addresses that fact.

9. A copy of the article is attached to the January 28, 1999 Katz affidavit. The article mentions Mr. Yoho by name, and references his sexual assault of an eight-year-old girl, without identifying the girl as his daughter.

10. Neither party further details the circumstances.

11. Yoho does not believe the employees who told her about the graffiti were trying to harass her, but rather did so to help her and let her know. (Dec. 1, 1998 Yoho Dep. at 101, 104–05, 117–19.)

these ten occasions, Yoho went into the men's restrooms to see the graffiti for herself. (Yoho's job duties did not require her to go into men's restrooms, and Yoho admits that the only reason she ever went into any of the men's restrooms was to see the graffiti about which she had been told.)

Yoho also personally witnessed vulgar graffiti written inside restroom stalls in a men's restroom on two occasions in May or June 1996. Yoho reported the graffiti to her supervisor.

On August 9, 1996, Yoho observed a parts tag sitting on some castings [12] that had a vulgar statement about her daughter written on it. That night (Yoho was working second shift), Yoho told the plant manager that she was going to quit; he told Yoho he did not want her to quit, and asked her to reconsider. The plant manager let Yoho leave work early that night, and decided to transfer her from her position as a supervisor on the second shift in the cam shaft department to the same position on first shift in the rod line department, "to try to get her away from the graffiti." [13] (Def.'s Jan. 29, 1999 Proposed Finding of Fact ¶ 36.) Yoho voluntarily agreed to this transfer, which did not include any change in pay. Yoho returned to work as a supervisor on the rod line on first shift on Tuesday, August 13, 1996. She worked the remainder of that week without incident.

Upon arriving at work the next Monday (August 19), Yoho learned (from her boyfriend, who was employed at Tecumseh) that more graffiti about her daughter had appeared in all three stalls of a men's restroom: "For a good time call Wendy Yoho's kid." (Id. ¶ 40.) Yoho immediately quit.

Yoho also claims that she heard hourly employees (versus supervisors/managers) make sexual comments in the workplace.

While testifying that the comments were "ongoing," Yoho can only recall one specific comment by content and speaker which occurred in mid–August 1996—an hourly employee asked her something to the effect of, "What was it? You didn't give it to him enough?" (Dec. 1, 1998 Yoho Dep. at 142.) Otherwise, Yoho cannot remember dates comments were made, number of occurrences, who made the comments, or what the comments were. (Id. at 138–45, 156–59, 165.)

Yoho filed a discrimination complaint with the Equal Employment Opportunity Commission on April 16, 1997. Yoho amended the discrimination complaint to add a claim for constructive discharge on July 8, 1997.

### Hostile Work Environment Claim

■ Title VII creates liability only for discrimination because of sex; it does not cover all workplace harassment. *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998); *Shepherd v. Slater Steels Corp.,* 168 F.3d 998, 1007–08 (7th Cir.1999). "We have never held that workplace harassment ... is automatically discrimination because of sex merely because the words used have sexual content or connotations. 'The critical issue ... is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Oncale,* 118 S.Ct. at 1002 (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). In addition, the alleged conduct must be severe or pervasive. *Burlington Indus. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998).[14]

Yoho alleges that she

was subjected to at least 14 separate incidents of sexually oriented writings

---

12. Neither party further details the circumstances.

13. Neither party further explains the plant manager's reasons, or how the transfer would get her away from the graffiti.

14. Tecumseh's response to the alleged harassment is not at issue on summary judgment.

directed at her or her daughter, at least five incidents where a newspaper article regarding the molestation of [Yoho's] daughter was posted or circulated in the workplace, one incident of specific sexual comments made by an hourly employee to [Yoho], and "unspecified" numbers of "unspecified" sexual comments made by other co-workers.

(Pl.'s Mar. 3, 1999 Br. at 9.)

The alleged sexual comments by co-workers are insignificant to this decision. With one exception, Yoho can give absolutely no specifics about the comments, and therefore may not rely on them to support her hostile work environment claim.

The newspaper articles, which are typical reports, are not sexually offensive on their face, and Yoho gives no persuasive argument to support her position that such articles constitute "sexual harassment." One article was placed in her mailbox, while others were found at various locations around the plant, some in areas where Yoho did not work. Yoho claims that the articles were "used for an evil purpose," (Pl.'s Mar. 3, 1999 Br. at 10), but there is no indication that they were posted because of Yoho's sex.[15]

█ The sexual writings occurred over a period of fourteen to fifteen months. All but one were written in the men's restrooms (which is not Yoho's work environment). Yoho knew about this graffiti, and went to look at it on five occasions, only because other employees told her about it (in a non-hostile manner). Yoho asserts that the graffiti was directed at her in her capacity as the only female line supervisor, with no male supervisors subjected to similar acts. (Pl.'s Mar. 3, 1999 Br. at 11.) However, there was sexual graffiti regarding Yoho's male supervisor, as well as graffiti about other male employees, in the men's restrooms (Pl.'s Mar. 3, 1999 Objections to Def.'s Proposed Findings of Fact ¶ 32F; Mar. 19, 1999 Penning Aff. ¶ 11);

Yoho's allegation that she was treated differently that her male counterparts is therefore weakened. Yoho's primary argument in support of her claim that she was harassed because she is a woman is that her predecessor (to the supervisor position on the cam shaft line), a female, was sexually harassed. However, that employee resigned as a supervisor in 1989 (six years before Yoho became a supervisor), and attests that she never experienced any conduct she considered to be discrimination or harassment. (Mar. 15, 1999 Zeller Aff.) Yoho also takes the position that plant management, who were all male, found the graffiti vulgar, extremely offensive, etc. (Pl.'s Mar. 3, 1999 Br. at 11), which to some extent works against her claim that she was harassed because of her gender. See Pasqua v. Metropolitan Life Ins. Co., 101 F.3d 514, 517 (7th Cir. 1996). Finally, Yoho testified in her deposition that the graffiti concerning her daughter, as well as the articles about her husband, were "personal" harassment, not harassment "directed at [her] sexually." (Dec. 1, 1998 Yoho Dep. at 18–19.)

Yoho argues that Baty v. Willamette Indus., Inc., 985 F.Supp. 987 (D.Kan.1997), is analogous, and leads to the conclusion that her harassment was sufficiently severe and pervasive to state a claim. In that case, the district court denied defendant employer's motion for judgment as a matter of law on the plaintiff's hostile work environment claim. The court concluded that the plaintiff had shown sufficiently severe and pervasive harassment, made up of numerous comments made by co-workers about plaintiff's breasts, and sexual comments on other subjects from a specified co-worker; numerous graffiti which referenced plaintiff in a sexual manner appeared in the men's restroom (seven examples which appeared over a three-month period are given); and co-employees questioned her about the graffiti, sometimes in vulgar terms. The plaintiff

---

**15.** Newspaper articles about male employees have been posted at the plant. (Mar. 19, 1999 Penning Aff. ¶ 14.)

in *Baty* was clearly subjected to significantly more severe and pervasive harassment than Yoho.

Given the nature and frequency of the incidents, Yoho cannot show that the harassment was sufficiently offensive or pervasive; nor has she presented adequate evidence to create an inference that the majority of the incidents were discrimination because of her sex. While the actions Yoho complains of may be considered in poor taste and extremely insensitive, the court concludes that they do not constitute harassment actionable under Title VII.

### Constructive Discharge Claim

■ To prevail on her constructive discharge claim, Yoho must establish that: (1) the conditions at Tecumseh were so intolerable that a reasonable person would have been compelled to resign; and (2) the working conditions were intolerable in a discriminatory way. *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir.1998).

For the same reasons discussed with respect to Yoho's hostile work environment claim, her constructive discharge claim will be dismissed.[16]

### Timeliness of Yoho's Claim

■ Even if the court found that Yoho had made sufficient allegations to constitute severe and pervasive harassment because of her sex, her claims would fail on timeliness grounds. A plaintiff must file an EEOC charge within 300 days of any alleged discriminatory action; 300 days before the filing of Yoho's initial EEOC complaint (which occurred on April 16, 1997) was June 20, 1996. *Hentosh v. Herman M. Finch Univ. of Health Sciences*, 167 F.3d 1170, 1999 WL 60393, No. 98–2511 (7th Cir. Feb. 9, 1999). Here, three of the alleged incidents of harassment occurred after the June 20, 1996 cut-off date: (1) on August 9, 1996, Yoho observed a parts tag sitting on some castings which contained a vulgar statement about her daughter; (2) an hourly employee asked her something

to the effect of, "What was it? You didn't give it to him enough?"; and (3) on August 19, 1996, Yoho learned that more graffiti about her daughter ("For a good time call Wendy Yoho's kid") had appeared in three stalls of a men's restroom. All other alleged incidents are barred unless they are considered to be "continuing violations," because they occurred before June 20, 1996.

"A continuing violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period." *Dasgupta v. University of Wis. Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir. 1997). Effects within the limitations period, resulting from unlawful acts that occurred earlier, do not save an untimely complaint. *Id.* at 1140.

"[T]he plaintiff may not base her ... suit on conduct that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on that conduct, as in a case in which the conduct would constitute, or be recognized, as actionable harassment only in the light of events that occurred later, within the period of the statute of limitations." *Galloway v. General Motors Service Parts Operations*, 78 F.3d 1164, 1167 (7th Cir.1996); *Garrison v. Burke*, 165 F.3d 565, 569–70 (7th Cir.1999).

■ Yoho argues that the alleged harassing actions "have a common nexus and were continuing to the time her employment ended," (Pl.'s Mar. 3, 1999 Br. at 6), so that there is a continuing violation. Yoho does not, however, claim that she did not recognize the harassment as actionable until the last three incidents, and in fact asserts that she was being subjected to sexual harassment from the beginning. The court cannot conclude that the three

---

**16.** The court notes that Yoho testified that she did not quit her employment because of sexual comments. (Dec. 1, 1998 Yoho Dep. at 160–61.)

incidents which occurred after June 20, 1996, were necessary to make Yoho's potential claim known to her, and those incidents, standing alone, are not severe or persuasive enough to support her Title VII claim.

## CONCLUSION

Defendant Tecumseh Products Company's motion for summary judgment is **GRANTED** and this action is **DISMISSED.**

**SO ORDERED** this 4th day of April, 1999.