Nancy L. DEMARAH, Plaintiff,

v.

TEXACO GROUP INC., Defendant.

No. Civ.A. 98–K–1521.

United States District Court,
D. Colorado.

March 23, 2000.

Andrew T. Brake, Lee T. Judd, Brian L. Lewis, Andrew T. Brake, P.C., Englewood, CO, for plaintiff.

John M. Husband, John A. Ramsey, Holland & Hart LLP, Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

Nancy L. DeMarah sues Texaco Group Inc. arising out of their employment relationship. She asserts claims for (1) Disability/Discrimination, (2) Discrimination based upon Sex; (3) Violation of the Equal Pay Act, 29 U.S.C. § 206 *et seq.;* (4) Retaliation; (5) Breach of Contract; and (6) Promissory Estoppel. Pending is Texaco's summary judgment motion on all claims. I deny the motion on the first, second and third claims and grant it on the fourth, fifth and six claims.

### 1. *Background.*

DeMarah has been employed by Texaco for approximately fifteen years. She claims she has been subjected to sex discrimination violative of both Title VII and the Equal Pay Act throughout her employment, including in 1989 when she was assigned to a position with a pay grade of 10, 11, or 12 doing accounting work, replacing a male who held the pay grade of 10. DeMarah continued to hold the pay grade of 6 for some time even though she lodged several complaints. Her pay grade was later raised.

In November 1995, DeMarah held a pay grade of 9. At that time she was diagnosed with breast cancer resulting in her absence from work for related medical care, treatment and surgery. She claims, upon her return to work in February 1996, she was harassed and barred from using a Texaco issued company handicap parking permit which the company later revoked. She obtained a handicap permit from the State of Colorado but was not allowed by Texaco to use the permit on its property.

DeMarah claims from February 1996, she worked full time and utilized vacation days and days off to undergo medical treatments. In August 1996, her supervisor was replaced and, according to DeMarah, the new supervisor harassed and discriminated against her as a result of her medical condition, placing unreasonable work demands on her and scrutinizing her unduly. The stress became intolerable and DeMarah was required to leave work for three weeks effective September 3, 1996.

DeMarah took time off work for reconstructive surgery due to her cancer and was told to utilize the remainder of her vacation before the end of December 1996. In January 1997, she was given a lower

rating than previously and maintains the basis therefore was her absenteeism due to her illness and the vacation she was ordered to take.

DeMarah requested to be placed under a new supervisor and was transferred to a new position with a lower pay grade, 8–9, depriving her of the opportunity to advance. She maintains other employees in similar circumstances and males who had requested different supervisors were treated differently and, in some cases, promoted.

On March 19, 1997, DeMarah filed a first charge of discrimination with the Equal Employment Opportunity Office ("EEOC"), asserting discrimination on the grounds of her disability. She states, thereafter, she continued to be harassed and discriminated against and was forced to take a second medical leave of absence due to a hostile work environment in the Fall of 1997. She maintains the above described course of events negatively impacted her including her levels of compensation and promotional opportunities. As a result, on October 30, 1997, DeMarah filed a second charge of discrimination on the grounds of gender and disability and asserting retaliation for her previously filed EEOC charge.

DeMarah underwent surgeries and treatment, including chemotherapy, for her breast cancer through the end of 1998 when her last surgery was performed. Her breast cancer is currently in remission.

## II. *Summary Judgment Standard.*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. *Simms v. Oklahoma ex rel. Dep't Mental Health & Substance Abuse Servs.,*

165 F.3d 1321, 1326 (10th Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999). Although the movant must show the absence of a genuine issue of material fact, it need not negate the nonmovant's claim. *Id.* Once the movant carries this burden, the nonmovant cannot rest upon her pleadings, but "must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which [she] carries the burden of proof." *Id.* "The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine;' an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant." *Lawmaster v. Ward,* 125 F.3d 1341, 1347 (10th Cir.1997).

### III. *Merits.*

#### A. *Statute of Limitations on Second and Third Claims for Relief.*

Texaco argues DeMarah's second and third claims under Title VII and the Equal Pay Act (EPA) are time barred. It asserts, although DeMarah claims her salary and pay grade in 1989 and again in 1991 (when she received a promotion) were too low, she did not file a charge alleging discriminatory pay until March 19, 1997, approximately eight years after she received a pay grade and salary with which she disagreed and approximately six years after she complained internally.

DeMarah responds Texaco's illegal conduct constituted a "continuing violation" of Title VII and the Equal Pay Act throughout the time she held a position on the intercorporate desk, that although she complained on an ongoing basis she was never promoted to a pay grade 10, nor recommended for such a promotion. She asserts the male who held the position before her was a pay grade 10 and the male who replaced her in 1997 was promised and promoted to a pay grade 10. Thus, DeMarah argues, her claims were timely filed pursuant to the continuing violation exception.

The EPA, incorporated into the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, requires that causes of action under the Act be brought within two years of accrual of the action. 29 U.S.C. § 255(a). Title VII bars a plaintiff from seeking relief for sex discrimination alleged to have occurred more than 300 days before a charge of discrimination is filed with the EEOC. 42 U.S.C. § 2000e–5(e)(1). The Tenth Circuit has recognized the continuing course of conduct doctrine, under which a claim of discrimination may include challenges to incidents which occurred outside the statutory time limitations of Title VII if the various acts constitute a " 'continuing pattern of discrimination.' " *Martin v. Nannie & the Newborns, Inc.*, 3 F.3d 1410, 1415 (10th Cir.1993) (quoting *Furr v. AT & T Technologies, Inc.*, 824 F.2d 1537, 1543 (10th Cir.1987))

The continuing violation doctrine is premised on the equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated. *Id.* n. 6. To invoke this exception to the Title VII charge-filing deadlines, a plaintiff must show either (1) a series of related acts taken against a single individual, one or more of which falls within the limitations period, or (2) the maintenance of a company-wide policy of discrimination both before and during the limitations period. *Purrington v. University of Utah*, 996 F.2d 1025, 1028 (10th Cir.1993) (citing *Bruno v. Western Elec. Co.*, 829 F.2d 957, 961 (10th Cir.1987)). DeMarah has not introduced facts to raise a triable issue on whether Texaco engaged in a company-wide policy of discrimination. The question therefore is whether she has introduced facts to raise a triable issue on whether there were a series of related acts against her sufficient to invoke the continuing violation doctrine.

Texaco relies on *Dasgupta v. University of Wisconsin Bd. Regents*, 121 F.3d 1138, 1139 (7th Cir.1997), where a psychology professor claimed the university discrimi-

nated against him in pay because of his national origin in violation of Title VII. *Dasgupta* distinguished "outright national-origin discrimination in pay and promotion" which would have supported a Title VII suit from sexual harassment type discrimination where duration is often necessary to convert what is merely offensive behavior, and therefore not actionable under Title VII, into actionable alteration in the plaintiff's working conditions. *Id.* at 1139–40. Dasgupta claimed, as a result of the early discrimination, his salary during the limitations period was much lower than that of his peers in the psychology department, because he received raises similar to those that his peers received, and since he was starting from a lower base he ended up lower too. The Seventh Circuit held "an untimely Title VII suit cannot be revived by pointing to effects within the limitations period of unlawful acts that occurred earlier," *id.* at 1140, because "[t]hat would make employers pay compensation for violations that were no longer actionable and would thus unravel the statute of limitations," *id.* The *Dasgupta* court, however, distinguished its facts from those in cases where the illegal act is repeated during the limitations period. *Id.*

Texaco relies on the following undisputed facts, arguing, as in *Dasgupta*, DeMarah cannot point to effects within the limitations period of unlawful acts that occurred outside of that period. DeMarah felt her pay grade was too low when she moved to an Intercorporate position in 1989. (Def.Mem.Supp.Summ.J. Undisputed Fact No. 6.) Her complaints regarding her pay are based upon pay she allegedly did not receive when she moved to the intercorporate position in 1989. (*Id.* No. 7.) She filed her first charge of discrimination on or about March 19, 1997, (*id.* No. 8), and second on or about October 30, 1997, (*id.* No. 9).

In opposition, DeMarah cites additional facts that, despite her complaints on an ongoing basis, she was never promoted to a pay grade 10 while the male who preced-

ed her in the position and the male who replaced her in 1997 were or were promoted to pay grade 10. (Pl.'s Revised Mem. Br.Resp.Defs.' Mot.Summ.J., Statement Additional Facts Nos. 1–4.) These facts raise a triable issue on the material issue of whether the alleged illegal acts were repeated during the limitations period or constituted a series of related acts against her sufficient to invoke the continuing violation doctrine. Accordingly, Texaco is not entitled to summary judgment on the second and third claims for relief.

**B.  *First Claim for Disability/Discrimination.***

Texaco argues the first claim must fail because DeMarah does not qualify as "disabled" under the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and, even if she does, it has not discriminated against her. The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Qualified individual with a disability" is defined as an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Disability" with respect to an individual means "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

Texaco argues DeMarah cannot establish she is "disabled" within the meaning of the ADA. While conceding cancer can constitute a physical impairment under the ADA, it maintains DeMarah cannot make the necessary showing that she is "substantially limited in a major life activity." In determining whether an ADA plaintiff is substantially limited in a major life activity, courts consider: "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437, 1444 (10th Cir. 1996) (quoting 29 C.F.R. § 1630.2(j)(2)).

It is Texaco's position that DeMarah, whose cancer is in remission, is not substantially limited in a major life activity. It cites the recent Supreme Court opinion in *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), foreclosing use of the predicted effects of the impairment in its untreated state for the purposes of considering whether a major life activity has been affected by a physical or mental impairment. The Court made clear § 12102(2)(A) requires "that a person be presently—not potentially or hypothetically—substantially limited." *Id.* at 2146. "A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity." *Id.* at 2147.

Texaco relies on *EEOC v. R.J. Gallagher Co.*, 181 F.3d 645, 653 (5th Cir.1999) in which the court applied the *Sutton* decision to the case of a cancer patient in remission, stating even though the plaintiff was required to undergo further chemotherapy sessions, those sessions and their effects did not constitute a substantial limitation of the major life activity of working especially where the plaintiff could follow this treatment schedule and still maintain his full workload. In *Gallagher*, the issue was whether Boyle was "disabled" within the meaning of the ADA "when he returned to the office and was confronted by Gallagher, his cancer had gone into complete remission and his doctors had cleared him for an unqualified return to work." *Id.* at 655. The only limitation claimed by Boyle at the time of the alleged discrimination was "his need to return to the hospital

for six monthly chemotherapy treatments." *Id.*

■ It is undisputed that DeMarah's cancer is currently in remission. (Undisputed Fact No. 1.) Citing DeMarah's deposition testimony, Texaco asserts she performed the essential functions of her job even during treatment. DeMarah denies this, citing her supporting affidavit to the effect that, as a result of each surgery performed between December 1995 and the end of 1998, she was required to miss much work and had limitations placed upon her ability to work in that her workload could not be increased and she could not work overtime. (Pl.'s Revised Me. Br.Resp. Def.'s Mot.Summ.J., Ex. A, ¶ 10.) Moreover, she asserts, at the time the alleged violation of the ADA occurred, she was not in remission.

In addition, DeMarah maintains her impairment affects other major life activities, in addition to working, including walking and caring for herself, and is thus distinguishable from *Gallagher*, where the court only considered the impairment of working. In this regard, DeMarah cites the following facts. She was diagnosed with breast cancer in about November 1995, underwent a double mastectomy in December, 1995, (Resp., Ex. A.¶ 6), was off work for approximately two months on short term disability, (*id.*), was in chemotherapy through the middle of 1996 and remained in treatment for her cancer through the end of 1998 when the last of her surgeries was performed, (*id.* ¶ 8). From the time of her surgery until completion of chemotherapy, she could not walk as she had done before, was only able to walk for short distances and was unable to care for herself. (*Id.* ¶ 9.) Her mother resided with her and took care of her and her youngest son went to live with his father, DeMarah's ex-husband. (*Id.*) She claims she had limitations placed upon her work in that her work load could not be increased and she could not work overtime as a result of each surgery. (*Id.* ¶ 10.) In addition, despite having a state issued handicapped parking placard for her car, she was not allowed to park in the handicapped parking area after a co-worker complained she was not sufficiently handicapped. (*Id.* at ¶¶ 11–13.) In July 1996, she was assigned a new supervisor who "began harassing me, including relative to my work load, attempting to assign additional job duties in excess of my restrictions and generally harassing me about my illness.... The conduct was so intolerable, that I was forced to take stress leave in approximately September, 1996 as approved by my physician." (*Id.* ¶ 14.)

This evidence suffices to create a material issue of disputed fact as to whether DeMarah was substantially limited in the life activities of working, walking and caring for herself at the time of the alleged discriminatory conduct for a period of sufficient duration so as to be considered "disabled" under the ADA. This case is distinguishable from *Madjlessi v. Macy's West, Inc.*, 993 F.Supp. 736 (N.D.Cal.1997), where plaintiff admitted except for the four days she took off each month she worked as usual, and *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187 (5th Cir.1996) where the court considered the major life activity of working only.

Additionally, Texaco argues, even if DeMarah is considered "disabled" under the ADA, it has not discriminated against her and has repeatedly accommodated her. With reference to the evidence cited above in relation to the issue of DeMarah's disability, a genuine issue also exists as to the material fact of whether Texaco reasonably accommodated DeMarah. I thus deny the motion for summary judgment on the first claim for relief.

### C. *Retaliation.*

■ Texaco argues the fourth claim must fail because DeMarah cannot establish a prima facie of retaliation. To survive summary judgment, DeMarah must present evidence establishing a genuine issue of fact that (1) she engaged in protected opposition to statutorily prohibited discrimination; (2) she was subjected to an adverse employment action subsequent to

or contemporaneous with her protected opposition; and (3) a causal connection exists between Texaco's adverse employment action and her protected activity. *See Trujillo v. University of Colorado Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998). Texaco concedes DeMarah satisfies the first element in that she filed a formal Charge of Discrimination with the EEOC on about March 19, 1997 and October 10, 1997. It argues she cannot, however, establish the second, namely that she suffered an adverse employment action contemporaneously with or after the filing of the charge.

" '[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.' " *Jeffries v. Kansas Dept. of Social Rehab. Servs.*, 946 F.Supp. 1556, 1557 (D.Kan.1996) (quoting *Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996)). " 'An adverse action is one that affects the terms, privileges, duration, or conditions of employment.' " *Id.* (quoting *Yerdon v. Henry*, 91 F.3d 370, 378 (2nd Cir.1996)).

■ DeMarah broadly claims Texaco subjected her to undue scrutiny and harassment which led to her stress leave, chastised her for abusing short term disability, and lowered her performance evaluation which will negatively impact her ability to progress within the company and pay decisions. In addition, she asserts the stress impacted her medical condition and resulted in her being demoted. To the contrary, however, DeMarah admits she received pay raises, increases in pay grade and promotions, (Undisputed Fact No. 4), and admits she received a promotion and pay increase in 1997 after receiving a G+ rating on her performance review for 1996,

which was lower than her 1995 S Rating, (Undisputed Facts No. 4). Moreover, although DeMarah states she was ordered to use vacation time, apparently for a 1998 surgery, she admits Texaco grandfathered her into a previous version of its Short Term Disability Policy so she would receive full disability and still have her vacation whereas the new version of the policy would have excluded such payment. (Undisputed Fact No. 14.) Nor do DeMarah's allegations of undue scrutiny and harassment rise to the level of adverse action, affecting a term and condition of her employment. *See Trujillo*, 157 F.3d at 1214 (holding an employer cannot be vilified for implementing policy or for monitoring its employees).

I conclude DeMarah has not come forth with evidence showing there is a genuine issue as to the material fact of whether she suffered any "adverse employment action" contemporaneously with or after the filing of the EEOC charges. Accordingly, Texaco is entitled to summary judgment on the fourth claim.

### D. Fifth and Sixth Claims for Breach of Contract and Promissory Estoppel.

Texaco argues DeMarah is employed at will and her fifth and sixth claims must fail because she cannot show the existence of an enforceable contract or promise. It asserts her reliance upon generally alleged violations of Texaco's policies and/or procedures relative to compensation levels and non-discrimination is to no avail, particularly in light of the clear disclaimers contained in its Policies and Procedures Manual.

DeMarah maintains her status as an "at-will" employee is irrelevant to the instant claims as an employer can be liable to an at-will employee where an implied contract arises out of company policy and employment manuals or where an employee relies on the policies and manuals to her detriment. *See Vasey v. Martin Marietta Corp.*, 29 F.3d 1460 (10th Cir.1994).

Moreover, even if a clear disclaimer exists, DeMarah asserts, the testimony of management that the policies or procedures are mandatory and are treated as mandatory may constitute a breach of contract. *See Evenson v. Colo. Farm Bur. Mut. Ins. Co.,* 879 P.2d 402 (Colo.App.1993).

Whether a disclaimer is conspicuous is a question of law. *Healion v. Great–West Life Assurance Co.,* 830 F.Supp. 1372, 1375 (D.Colo.1993). Texaco's Human Resources Department issued the Policy and Procedures Manual ("Manual"). The introduction to the Manual states:

> This manual does not create a contract, express or implied between the company and any employee of the company. Employment is terminable at will by either the company or the employee at any time, for any reason, with or without notice. None of the policies or benefits contained in this manual are intended to confer any rights or privileges upon any particular employee or group of employees or to entitle any employee or group of employees to remain employed by the company.

> In the event there is any inconsistency between the contents of this manual and actual practice or contradictory statements by company representatives or supervisors, the manual shall govern.

(Defs.' Mem. supp. Mot.Summ.J., Ex. 15.) The Manual also states it "is subject to change at the company's sole discretion." (*Id.,* Ex. 16.) Texaco's Human Resources Department also issued a "Texaco's Pay Policy" brochure, stating various factors determine "salary, including but not limited to job evaluation, external and internal equity, and pay for performance." (*Id.,* Ex. 19.)

I find as a matter of law the disclaimer appears prominently in the Manual's introduction and is conspicuous. Moreover, as DeMarah admits, she signed acknowledgment forms in 1985, 1994, 1995 and 1997, stating she had read the Texaco Corporate Guidelines (Guidelines) setting out the company's expectations of its employees (Defs.' Mem.Supp.Mot.Summ.J., Exs. 27, 28). Those Guidelines state they "are a statement of policies for individual and business conduct and do not, in any way, create any contractual or other employment rights or any assurance of continued employment inasmuch as all employment is at will, terminable by either the employee or the company at any time, with or without cause and with or without notice." (*Id.,* Ex. 29.)

Given the finding that the disclaimer is conspicuous, to establish the Manual constituted a binding contract, DeMarah would have to show the testimony of management that the policies or procedures are mandatory and are treated as mandatory to establish a breach of contract claim based on the Manual. *See Evenson,* 879 P.2d at 409. In this regard, DeMarah cites the deposition of one of Texaco's managers, Larry Mickelson, who stated as to pay grade, if a job became vacant and had an assigned value of a pay grade ten, "probably in most cases" the person moved into that job would assume that pay grade. (Pl.'s Rev.Mem.Br.Resp. Def.'s Mot. Summ.J., Ex. 5 at 28–29.) He acknowledged there might be circumstances, of which he was not aware, in which that would not be the case. (*Id.*) In her affidavit, DeMarah also asserts she has "been informed by members of human resources that the policies and procedures of Texaco are official and are to be followed until such time as [they] have been replaced." (Resp., Ex. A.¶ 23.)

This broad statement and the testimony of Mickelson do not amount to the type of specific evidence considered by *Evenson* to overcome the presumption of employment at will. There, several managers, including the Chief Personnel Officer, testified on Evenson's behalf that they regarded the disciplinary measures at issue as mandatory and treated them as such. *See Evenson,* 879 P.2d at 409. Viewing the evidence in the light most favorable to DeMarah, it is insufficient to support a claim that Texaco's Manual and Pay Policy

were mandatory or sufficient to create a contractual obligation. *See Vasey,* 29 F.3d at 1465. Similarly, in light of the conspicuous disclaimers, the evidence does not support the conclusion that "the employer could reasonably have expected the employee to consider the employee manual as a commitment from the employer," *Continental Air Lines, Inc. v. Keenan,* 731 P.2d 708, 712 (Colo.1987). The promissory estoppel claim thus also fails.

▆ Finally, the EEOC policy statement incorporated in the Manual that "Texaco provides equal employment opportunity for all employees 'without regard to ... sex, ... disability,'" (Defs.' Mem. Supp.Mot.Summ.J.Ex. 17), constitutes an indefinite assurance that cannot be enforced under the law of contract or promissory estoppel. *See Vasey,* 29 F.3d at 1465; *Johnson v. Cadillac Plastics Group, Inc.,* 908 F.Supp. 847, 851–52 (D.Colo.1995). I therefore grant summary judgment on the fifth and sixth claims.

### IV. *Conclusion.*

For the aforesaid reasons, I deny summary judgment on the first, second and third claims for relief, and grant summary judgment on the fourth, fifth and sixth claims. Accordingly,

IT IS ORDERED THAT Defendant's Motion for Summary Judgment is DENIED insofar as it seeks dismissal of the first claim for Disability/Discrimination, second claim for Discrimination based upon Sex; and third claim for Violation of the Equal Pay Act, 29 U.S.C. § 206 *et seq.* and GRANTED insofar as it seeks dismissal of the fourth claim for Retaliation, fifth claim for Breach of Contract and sixth claim for Promissory Estoppel;

IT IS FURTHER ORDERED THAT this matter is set for a pretrial conference on **Tuesday April 25, 2000 at 10:30 a.m. Courtroom C–401.** Please review and comply with §§ II and III of this Court's Pretrial and Trial Procedures Memorandum in preparation for this conference.

Counsel shall meet in advance of the pretrial conference to prepare a Proposed Pretrial Order. Exhibit lists and witness lists should also be prepared for submission at this conference. Counsel are to have met and to indicate on their exhibit lists those exhibits to which they stipulate.

The parties shall also meet at least ten days before the pretrial conference to settle the jury instructions and verdict forms. The proposed jury instructions and the challenged jury instructions shall be submitted to the Court, with a memorandum of law setting forth each party's objections, at least five days before the pretrial conference. The parties are required to submit the instructions on hard copy and on computer disks compatible with WordPerfect 9.

The case will be set for trial when the Pretrial Order is approved by the court.