In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 01-3064 & 01-3690

REINEE HILDEBRANDT,

*Plaintiff-Appellant,*

*v.*

ILLINOIS DEPARTMENT OF NATURAL RESOURCES
and RICHARD LITTLE,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Central District of Illinois.
No. 98 C 3313—**Jeanne E. Scott**, *Judge.*

ARGUED MARCH 31, 2003—DECIDED OCTOBER 30, 2003

Before BAUER, RIPPLE and MANION, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Reinee Hildebrandt brought this action against her employer, the Illinois Department of Natural Resources ("IDNR"), for sex discrimination pursuant to Title VII and the Equal Pay Act. She also brought claims against her coworkers and supervisors, in their individual capacities, for unequal treatment on the basis of her sex in violation of 42 U.S.C. § 1983. The district court granted summary judgment to the IDNR on Dr. Hildebrandt's Title VII claims and to the individual defen-

dants, with the exception of Richard Little, Dr. Hildebrandt's immediate supervisor, on the § 1983 claims.

At trial, the district court entered a directed verdict for Mr. Little on the remaining § 1983 claim, and the jury returned a verdict in favor of Dr. Hildebrandt on her Equal Pay Act claim. The district court also awarded Dr. Hildebrandt attorneys' fees; however, the court denied her the full amount sought because of her limited success on the merits.

Dr. Hildebrandt now appeals the district court's entry of summary judgment, the directed verdict and the court's reduced fee award. For the reasons set forth in this opinion, we affirm in part and reverse in part the judgment of the district court, we vacate the award of attorneys' fees, and we remand for further proceedings.

# I

# BACKGROUND

## A. Factual Background

Reinee Hildebrandt, who holds a Ph.D. degree in forestry, was hired as a program administrator by the IDNR in 1991. When hired, she was paid the second highest salary among the four program administrators. The other three administrators, John Sester, Pete Skuba and Robert Schmocker, were male. All held bachelor's degrees; none of them had a doctoral degree.

Each program administrator oversaw different forestry programs in Illinois; Dr. Hildebrandt oversaw Urban Forestry. Her direct supervisor was Richard Little. Mr. Little evaluated the performance of each program administrator annually and assigned a performance rating according to the following scale: exceptional, accomplished, acceptable

and unacceptable.[1] Mr. Little also recommended annual raises based on the evaluations and budgetary restrictions. In performing this task, he was constrained by the IDNR's Merit Compensation Guidelines, which provided a range of appropriate raises for each rating. Stewart Pequignot, the State Forester, was Mr. Little's supervisor. Mr. Pequignot reviewed Mr. Little's evaluations and raise recommendations, and approved all annual raises.

By July 1, 1994, Dr. Hildebrandt's salary was less than all three of the other program administrators. In 1993 and 1994, she had received a "needs improvement" overall rating and, consequently, had received no raise in 1993 and a smaller raise than others in 1994. From 1994 to 1997 Hildebrandt received a lower overall salary than the other three administrators. In each of those years, at least one of the male program administrators received a larger percentage raise than did Dr. Hildebrandt. In 1997, Dr. Hildebrandt and two of the other administrators, Skuba and Schmocker, all received the same rating of "accomplished." Nevertheless, although all three raises were within the IDNR's Merit Compensation Guidelines for the "accomplished" rating, Dr. Hildebrandt received a lower percentage raise than the other two.[2] In 1998, no employee received a raise because of

---

[1] During the earlier years of Dr. Hildebrandt's employment the ratings were: superior, exceeds expectations, meets expectations, needs improvement and unacceptable.

[2] Dr. Hildebrandt asserts in her brief that each year Mr. Little gave her "the lowest salary percentage increase that he could give her pursuant to the Merit Compensation Guidelines. (Appendix p. 1402a-1416a)." Appellant's Br. at 27. Yet, the cited trial testimony shows that, although in 1997 Mr. Little did give Dr. Hildebrandt the lowest possible raise under the guidelines, the
(continued...)

budget constraints. In 1999 and 2000, the four administrators all received either 4.39% or 4.40% raises.

Dr. Hildebrandt also alleges that she experienced unfair treatment in her working conditions apart from compensation. For example, she alleges that she, unlike the men, was not allowed to communicate directly with forestry employees; that she was required to submit monthly goal statements; that she was denied adequate support staff; that staff workers were disrespectful to her and were more friendly to the male administrators; that she was provided fewer interns; that she was denied computer equipment; and that she was provided slower reimbursement. More generally, Dr. Hildebrandt complains about the treatment she received from Anna May Brown, who was Mr. Pequignot's secretary and was in charge of the secretarial staff for the forestry division. The defendants dispute the claims of discriminatory treatment and claim that Dr. Hildebrandt received the same treatment as the male program administrators.

Dr. Hildebrandt began complaining about the inequity in her treatment in 1992.[3] In 1995 or 1996, she asked the Illinois Central Management Services to provide her with information concerning her salaries and the salaries of the other administrators. At that time, she learned that her pay had fallen behind the others. In 1996, she complained about

---

[2] (...continued)
guidelines gave Mr. Little no discretion in 1993, 1994, 1995 and 1996. *See* Appellant's App. at 1407a, 1410a, 1411a-12a, 1412a-13a. In those years, the guidelines dictated the exact percentage to be given in light of her rating. R.112 at 97, 100-03. Thus, as Mr. Little testified, the raise he gave her was "the only option" he had open to him. *Id.*

[3] According to Dr. Hildebrandt, these complaints also mark the beginning of the retaliatory treatment by the defendants.

the salaries and asked to speak with the IDNR Director Brent Manning, but was directed to speak with Kirby Cottrell, who was the Director of the Office of Resource Conservation and supervised Mr. Pequignot.

On June 16, 1997, Dr. Hildebrandt filed an internal charge of discrimination with the IDNR's Equal Employment Opportunity Officer, Theresa Cummings. Cummings recommended that a meeting be held and that Dr. Hildebrandt's salary be reviewed for adjustment. On March 31, 1998, a meeting was held with Dr. Hildebrandt, John Comerio (who was the IDNR Deputy Director), Mr. Pequignot, Mr. Little and Cummings. At the meeting, there was no agreement as to whether a pay inequity existed. No adjustments were made to Dr. Hildebrandt's salary.

On May 6, 1998, Dr. Hildebrandt filed a charge of discrimination with the EEOC. She subsequently received a right-to-sue letter and then filed this action on December 29, 1998.

After the filing of this action, other pertinent events took place. Beginning with her 1998 evaluation, David Gillespie sat in on her annual evaluation conducted by Mr. Little,[4] while Mr. Little alone attended the men's reviews. Additionally, Mr. Little advised Dr. Hildebrandt that she would be subject to semi-annual or quarterly evaluations, while the men had only annual evaluations. The record does not indicate whether or not these more frequent evaluations were ever imposed.

---

[4] David Gillespie was the Section Manager for Field Operations. Gillespie was supervised by Mr. Pequignot and held the same level in the administration as Mr. Little. The record is not clear as to the reason that Gillespie attended Dr. Hildebrandt's reviews.

### B. District Court Proceedings

#### 1.

In her complaint, Dr. Hildebrandt brought claims against Mr. Little, Ms. Brown, Mr. Pequignot and Mr. Cottrell pursuant to 42 U.S.C. § 1983. She alleged that they had violated her right to equal protection of the laws by treating her less favorably than males with regard to pay raises and to the non-compensatory conditions of her employment. She also brought an Equal Pay claim and two Title VII claims against the IDNR; one of the Title VII claims concerned allegedly unlawful discrimination on the basis of her sex with respect to pay and other terms of her employment, and the other concerned retaliation that Dr. Hildebrandt allegedly experienced after she complained of the unlawful discrimination.

#### 2.

On February 20, 2001, the district court granted summary judgment to the defendants on several of Dr. Hildebrandt's claims. First, the district court held that the statute of limitations barred some of the claims. The court held that Dr. Hildebrandt's Title VII compensation discrimination claim was barred by the 300-day statute of limitations. The court pointed out that Dr. Hildebrandt had failed to demonstrate that she had been given a discriminatory raise after July 10, 1997, which marked the beginning of the limitations period. The court further held that Dr. Hildebrandt's Title VII claim concerning unequal treatment in the non-compensatory conditions of her employment also was limited by the statute of limitations. The court construed Dr. Hildebrandt's claim as one for a hostile work environment and held that Dr. Hildebrandt could rely only on acts that occurred after July 10, 1997, to support her claim. The court noted that

"[m]ost of Hildebrandt's complaints concern actions taken by Brown and [staff] prior to that date." R.81 at 17. It concluded that "the acts that [Dr. Hildebrandt] documents after that date do not constitute a discriminatory work environment" because they do not suggest a workplace "so permeated with discriminatory intimidation, ridicule, and insult" that they "alter the conditions of her employment and create[] an abusive work environment." *Id.* at 17-18.

Turning to the § 1983 claims, the court held that "the § 1983 two-year statute of limitations barred any claims for discrimination that occurred prior to December 29, 1996." *Id.* at 18. The court noted that "[a]fter that date, the only unequal treatment respecting compensation occurred on July 1, 1997, when Hildebrandt received the same rating as Skuba and Schmocker, but received a lower percentage raise than either of them." *Id.* The court determined that Dr. Hildebrandt could proceed to trial on the § 1983 claim against Mr. Little concerning whether he "intentionally gave her a smaller raise because of her gender" in 1997. *Id.* However, Dr. Hildebrandt could not proceed against any of the other individual defendants under § 1983 for the 1997 raise because Mr. Little was "the only Defendant who directly participated in this possibly discriminatory act" and § "1983 requires direct participation." *Id.* at 18-19.

In arriving at these determinations, the court rejected Dr. Hildebrandt's arguments that her claims were not barred by the statute of limitations because of the continuing violation doctrine, the discovery rule, and also because "at the 1998 meeting, and other times within the statute, the Defendants failed to correct the effects of past discrimination." *Id.* at 20-21.

The district court further held that the individual defendants, Mr. Little, Ms. Brown, Mr. Pequignot and Mr. Cottrell, were entitled to qualified immunity on all of Dr.

Hildebrandt's "§ 1983 claims based on Hildebrandt's treatment at the workplace unrelated to her compensation." *Id.* at 16. The court held that Dr. Hildebrandt had presented no precedent to the court that "established that denying staff support, inequitable treatment by management of the type shown here, or slow reimbursement constituted gender discrimination." *Id.* Finally, the court held that Dr. Hildebrandt had failed to establish a Title VII retaliation claim. *See id.* at 22.

Before trial, therefore, the court dismissed all counts except the Equal Pay Act claim and the § 1983 disparate pay claim against Mr. Little. Consequently, the court dismissed Ms. Brown, Mr. Pequignot and Mr. Cottrell from the case.


### 3.

During the trial on the remaining counts, the district court did not allow Dr. Hildebrandt to testify concerning Cummings' statement that Director Manning had "approved Cummings' recommendations" at the March 1998 meeting. The court held that the testimony was hearsay. The court further refused to allow the admission of this testimony as a party admission because the court "[did]n't view [Cummings] as someone in charge of the Department who is speaking for the Department. And it is the Department being sued."[5] R.110 at 183. Similarly, the court did not allow into evidence exhibits 49 and 49A, a letter from Cummings

---

[5] However, the court did let Dr. Hildebrandt testify to the statements of Mr. Cottrell, Mr. Pequignot and Mr. Little made at that same meeting because the court "view[ed] their admissions as binding upon the Department as party admissions" because "they are in positions of authority within the Department." R.110 at 183-84.

and her recommendations to Director Manning, because the exhibits were hearsay and because Cummings already had testified to their contents. R.154 at 543-44.

At trial, at the close of the plaintiff's case, the district court granted a directed verdict to Mr. Little on the claim that he discriminated against Dr. Hildebrandt by giving her a lower raise in 1997. The court gave two reasons. First, Dr. Hildebrandt testified that the evaluation she received in 1997 "was not a bad evaluation" and "[s]he also testified that she knew that Dick Little followed the C.M.S. Guide-lines" and thus under her "own version of the facts . . . Little did not intentionally give her a smaller raise in that year because of her gender." R.155 at 684. Second, Mr. Little was entitled to qualified immunity because it was not clearly established that giving a lower raise within a set guideline range, that was presented to Mr. Little by another agency and that he was directed to follow, would constitute a constitutional violation. *See id.*

The jury returned a verdict for Dr. Hildebrandt on the Equal Pay Act claim and found that the IDNR willfully had violated the act. Consequently, the court awarded Dr. Hildebrandt $25,000 in backpay plus $25,000 in liquidated damages. Finally, because of Dr. Hildebrandt's limited success on the merits, the court awarded her only $65,052 in attorneys' fees, two-thirds of $97,578 requested by Dr. Hildebrandt.

## II

### DISCUSSION

#### A. Standard of Review

Our review of a district court's grant of summary judg-ment or a judgment as a matter of law is de novo. *See Mauler*

*v. Bayfield County*, 309 F.3d 997, 1000 (7th Cir. 2002), *cert. denied*, 123 S. Ct. 2076 (2003); *O'Neal v. City of New Albany*, 293 F.3d 998, 1003 (7th Cir. 2002). Summary judgment is appropriate only when, after construing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Mateu-Anderegg v. Sch. Dist. of Whitefish Bay*, 304 F.3d 618, 623 (7th Cir. 2002).

However,

[i]n reviewing a district court's grant of summary judgment, we consider only those matters that were before the district court when it entered the judgment. Our review is confined to an examination of the materials before the court at the time the rulings were made. Neither the evidence offered subsequently at the trial nor the verdict is relevant.

*Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 242 (4th Cir. 2002) (internal quotation marks and citations omitted); *see also Chapman v. Al Transport*, 229 F.3d 1012, 1028 (11th Cir. 2000) (stating that "because the district court did not have the testimony from the trial of the ADA claims before it when it granted summary judgment in favor of the defendants on the ADEA claims, any evidence offered at trial is not relevant to our review of the ADEA summary judgment and we will not consider it" and citing cases from the First, Second, Fifth and Tenth circuits).

### B.  Title VII Claims

Dr. Hildebrandt brings two types of claims: She alleges that she was discriminated against on the basis of her sex (1) in her compensation and evaluations as evidenced by her lower raises; and (2) in the terms and conditions of her

employment through alleged inequitable treatment at the workplace.[6] Although these claims are brought under Title VII and under § 1983, for ease of analysis we first address Dr. Hildebrandt's Title VII claims.

The district court dismissed the Title VII claims against the IDNR on the basis that Title VII's 300-day statute of limitations (1) barred Dr. Hildebrandt's Title VII disparate pay claim and (2) limited "Hildebrandt's [Title VII] claim of a discriminatory work environment to acts that occurred after July 10, 1997," concluding that "[t]he acts that [Dr. Hildebrandt] documents after that date do not constitute a discriminatory work environment." R.81 at 17. Dr. Hildebrandt submits on appeal that the district court erred in these rulings.

### 1. Title VII—Disparate Pay

#### a. Statute of Limitations

With respect to her discriminatory pay claim, Dr. Hildebrandt, relying on the Supreme Court's holding in *Bazemore v. Friday*, 478 U.S. 385 (1986), and on our case *Wagner v. NutraSweet*, 95 F.3d 527 (7th Cir. 1996), contends that the allegedly discriminatory compensation from 1992 to 1997[7] constituted a continuing violation, and thus her

---

[6]  Dr. Hildebrandt presents no argument in her brief with respect to her retaliation claim. Any arguments with respect to those claims, therefore, are waived.

[7]  In her brief, Dr. Hildebrandt argues that the range is "from 1992 through 1999" because she "claims that her performance evaluation and salary increase in FY99 was the product of unlawful discrimination." Appellant's Br. at 36, 40. Yet, Dr.

(continued...)

receipt of paychecks at a discriminatory rate after July 10, 1997, satisfied the statute of limitations. Dr. Hildebrandt's brief argues that the continuing violation doctrine allows her to recover for the entire period of 1992 through 1997. However, at oral argument, Dr. Hildebrandt affirmatively stated that she was seeking recovery on her Title VII claim only for paychecks she received inside the 300-day charge filing period, that is, those received after July 10, 1997, which reflect the last allegedly discriminatory raise given to her on July 1, 1997.

### i) *Bazemore* and its progeny

In *Bazemore*, 478 U.S. at 395-96, the Supreme Court stated that "[e]ach week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII." In *Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1003 (7th Cir. 1994), and *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996), we read *Bazemore* as holding that disparate pay claims were continuing violations: "Pay increases are typically continuing violations, because each paycheck at a discriminatory rate is seen as the basis for a separate claim. *Bazemore v. Friday*, 478 U.S. 385 (1986)."

---

[7] (...continued)
Hildebrandt has not brought forth any evidence that the 1999 raise or performance evaluation was discriminatory. In 1999, Dr. Hildebrandt received exactly the same performance evaluation and raise as her male coworkers. All of them received a 4.4% raise and all of them received an evaluation of "accomplished." Defendant's Ex.38. Similarly, in 1998, all of the employees received the same rating "accomplished," and no one received a raise due to budget constraints. Thus, 1997 is the last year for which Dr. Hildebrandt has brought forth evidence of disparate treatment in compensation.

*Chambers*, 17 F.3d at 1003 (parallel citations omitted); *NutraSweet*, 95 F.3d at 534 (same). Further, other courts of appeals interpreted *Bazemore* to hold that pay claims were continuing violations. *See, e.g., Cardenas v. Massey*, 269 F.3d 251, 257 (3d Cir. 2001) (stating that "[m]ost courts appear to treat pay discrimination claims as continuing violations" (internal quotation marks and citations omitted)).

We later seemed to depart from this conclusion in *Dasgupta v. University of Wisconsin Board of Regents*, 121 F.3d 1138, 1140 (7th Cir. 1997). In that case, we distinguished *Bazemore* and *NutraSweet* as cases involving claims "where the illegal act is repeated during the limitations period." *Id.* at 1140. We noted: "Any illegal act that takes place in the limitations period is actionable; the limitations bar falls only on earlier acts. A lingering effect of an unlawful act is not itself an unlawful act, however, so it does not revive an already time-barred illegality. . . ." *Id.* We went on to explain:

> In *Bazemore* and *NutraSweet*, the plaintiffs alleged that during the limitations period they failed to receive the amount of compensation that the law entitled them to. The fact that this level had been determined before the limitations period meant only that the violation of their rights was predictable. If an employer tells his employee, "I am going to infringe your rights under Title VII at least once every year you work for me," this does not start the statute of limitations running on the future violations, violations that have not yet been committed. This case is at the opposite pole. There were no new violations during the limitations period, but merely a refusal to rectify the consequences of time-barred violations. It is not a violation of Title VII to tell an employee he won't get a raise to bring him up to the salary level that he would have attained had he not been

> discriminated against at a time so far in the past as to be outside the period during which he could bring a suit seeking relief against that discrimination.

*Dasgupta*, 121 F.3d at 1140. Despite this statement in *Dasgupta*, we subsequently have recognized that "[d]rawing the line between something that amounts to a 'fresh act' each day and something that is merely a lingering effect of an earlier, distinct, violation is not always easy." *Pitts v. City of Kankakee*, 267 F.3d 592, 595 (7th Cir. 2001), *cert. denied*, 536 U.S. 922 (2002).

### ii)  *National Railroad Passenger Corp. v. Morgan*

The Supreme Court in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), has clarified the applicability of the "continuing violation" doctrine. The Supreme Court explained the requirements for two types of acts: discrete discriminatory acts and acts contributing to a hostile environment. As to discrete acts, the Court explained:

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

*Morgan*, 536 U.S. at 113. Thus the Supreme Court in *Morgan* "foreclosed the use of the continuing violation doctrine to incorporate untimely claims for discrete discriminatory actions even though they may be related to a timely claim." *Peters v. City of Stamford*, No. 3:99-CV-764 CFD, 2003 WL 1343265, at *5 (D. Conn. Mar. 17, 2003).

However, the Court in *Morgan* went on to explain that for hostile work environment claims,

> [t]he timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Morgan*, 536 U.S. at 116.

Not only did *Morgan* speak to the applicability of the continuing violation doctrine to discrete acts of discrimination, it also offered guidance with respect to what actions might be considered a "discrete act." According to the Court, the following actions constitute discrete acts: "termination, failure to promote, denial of transfer, or refusal to hire." *Id.* at 114. More specifically, *Morgan* gives guidance in the area of equal pay violations. In *Morgan*, the Supreme Court expressly relied on its statement in *Bazemore* regarding each paycheck paid at a discriminatory rate as an example of an actionable "discrete act or single occurrence, even when it has a connection to other acts." *Id.* at 111 (internal quotation marks and citations omitted). Notably, the Court did not characterize *Bazemore* as involving a "continuing violation" or as embracing a continuing

violation doctrine. Indeed, the Court noted that "in *Bazemore* . . . although the salary discrimination began prior to the date that the act was actionable under Title VII, '[e]ach week's paycheck that deliver[ed] less to a black than to a similarly situated white is a wrong actionable under Title VII.' " *Id.* at 2071 (quoting *Bazemore*, 478 U.S. at 395). Thus, the Court in *Morgan* reaffirmed the *Bazemore* statement that each discriminatory paycheck was a separate discriminatory act that could give rise to a Title VII action. Consequently, reading *Bazemore* in light of M*organ*, a plaintiff cannot make timely any prior time-barred discrete acts of discriminatory pay by filing within the time frame of one discriminatory paycheck.

Prior to *Morgan*, other courts had anticipated its holding and determined that discriminatory paychecks were discrete acts not subject to a continuing violation doctrine. *See, e.g., Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 119 (2d Cir. 1997) (stating that "a claim of discriminatory pay is fundamentally unlike other claims of ongoing discriminatory treatment because it involves a series of discrete, individual wrongs rather than a single and indivisible course of wrongful action"). Indeed, in spite of our statements in *NutraSweet* and *Chambers*, we had stated elsewhere in dicta that repeated paychecks at a discriminatory rate were discrete acts. *See Heard v. Sheahan*, 253 F.3d 316, 320 (7th Cir. 2001) (explaining that separate paychecks would be discrete acts and citing to the case law of other circuits, including *Pollis*, 132 F.3d at 119); *see also CSC Holdings, Inc. v. Redisi*, 309 F.3d 991, 992 (7th Cir. 2002) (explaining the existence of a "contrast between a continuing wrong, such as deliberate indifference to a prisoner's medical treatment, and discrete acts, such as consistently underpaying an employee because

of her sex," in a non-Title VII case decided after *Morgan*).[8]

Cases subsequent to the Supreme Court's decision in *Morgan* have recognized that repeated discriminatory paychecks constitute discrete acts and that a plaintiff cannot render timely any time-barred discriminatory paychecks merely by filing with respect to subsequent discriminatory paychecks within the limitations period. *See Quarless v. Bronx-Lebanon Hosp. Ctr.*, 228 F. Supp. 2d 377, 382 (S.D.N.Y. 2002) (stating in a post-*Morgan* decision that "[b]ecause each paycheck that the Plaintiff received was an (alleged) immediate and individual wrong which gave rise to a separate disparate pay claim, the Plaintiff cannot use the continuing violation doctrine to render timely any disparate pay violations which occurred outside the 300 day statute of limitations"); *Inglis v. Buena Vista Univ.*, 235 F. Supp. 2d 1009, 1023 (N.D. Iowa 2002) (extensively discussing

---

[8]  The Second Circuit in *Pollis v. New School for Social Research*, 132 F.3d 115 (2d Cir. 1997), recognized the Supreme Court's state-ment in *Bazemore* that each " 'paycheck that delivers less to a [disadvantaged class member] than to a similarly situated [favored class member] is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date' of limitation." *Id.* at 119 (brackets in original) (quoting *Bazemore*, 478 U.S. at 395-96). Nevertheless, rather than construing the *Bazemore* statement as regarding a continuing violation, the Second Circuit explained that "each continuation or repetition of the wrongful conduct may be regarded as a separate cause of action for which suit must be brought within the period beginning with its occurrence." *Id.* Consequently, "a cause of action based on receipt of a paycheck prior to the limitations period is untimely and recovery for pay differentials prior to the limitations period is barred irrespective of subsequent, similar timely violations." *Id.*; *see also Knight v. Columbus*, 19 F.3d 579, 582 (11th Cir. 1994).

*Bazemore* and the precedents of other circuits in light of *Morgan*, and stating that "[b]ecause each discriminatory paycheck is unlawful, issuance of such a paycheck is a discrete act of discrimination that, like a termination, a failure to promote, or refusal to hire, is easily identifiable, its occurrence can be pinpointed in time, *and is itself actionable.*" (emphasis added)).

*Morgan*'s foreclosure of the continuing violation doctrine for discrete discriminatory acts clearly requires a reevaluation of our earlier interpretation. Using *Morgan* as our guide, therefore, we must conclude that each of Dr. Hildebrandt's paychecks that included discriminatory pay was a discrete discriminatory act, not subject to the continuing violation doctrine.[9] Therefore, Dr. Hildebrandt may only recover for the discriminatory pay received within the statute of limitations period. Mr. Little allegedly gave Dr. Hildebrandt a discriminatory annual raise on July 1, 1997. She filed her charge 300 days after July 10, 1997. Thus Mr. Little's act of deciding to give Dr. Hildebrandt a discriminatory annual raise is outside of the limitations period and, under *Morgan*, she cannot reach any paycheck prior to July 10, 1997.

However, the same is not true for paychecks received after July 10, 1997, that reflect the July 1, 1997 discriminatory raise. As the Second Circuit, in a post-*Morgan* decision, recently explained:

> In *Bazemore*, the employer's act of cutting each weekly paycheck was deemed to give rise to a new claim of an unlawful employment practice. . . . The clear message of *Bazemore* is that an employer performs a separate

---

[9]   We note that another panel of this court has reached the same conclusion with respect to *Morgan*'s effect on discriminatory pay claims. *See Reese v. Ice Cream Specialties, Inc.*, No. 02-1633, slip op. at 9 (7th Cir. Oct. 30, 2003).

employment practice each time it takes adverse action against an employee, even if that action is simply *a periodic implementation of an adverse decision previously made.*

*Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 134 (2d Cir. 2003) (emphasis added).

The Second Circuit's commentary is consistent with and helps explain our own distinction in *Dasgupta*. In *Dasgupta* we stated that:

> In *Bazemore* and *NutraSweet,* the plaintiffs alleged that during the limitations period they failed to receive the amount of compensation that the law entitled them to. The fact that this level had been determined before the limitations period meant only that the violation of their rights was predictable. If an employer tells his employee, "I am going to infringe your rights under Title VII at least once every year you work for me," this does not start the statute of limitations running on the future violations, violations that have not yet been committed.

*Dasgupta*, 121 F.3d at 1140. *Bazemore* and *NutraSweet* thus must be read as involving the "periodic implementation of an adverse decision previously made." *Elmenayer*, 318 F.3d at 134. Such a "periodic implementation" of a decision to discriminate against an individual is a discrete act of discrimination and is distinct from "a refusal to rectify time-barred violations," which does not constitute an actionable wrong under Title VII. *Dasgupta*, 121 F.3d at 1140.

### b. Merits of Title VII-Disparate Pay Claim

Having found that Dr. Hildebrandt's Title VII pay claim, at least with respect to her 1997 raise, is not barred by the statute of limitations, we turn to the merits of that claim.

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). "Proof of intentional discrimination is required under a disparate treatment analysis." *Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1036 (7th Cir. 1998). "A Title VII plaintiff can satisfy her burden of proof by two avenues: (1) she may present direct evidence of discriminatory intent or, because of the difficulty in directly proving discrimination, (2) she may use the indirect, burden-shifting procedure set forth in *McDonnell Douglas* . . . ." *Id.* at 1031; *see also Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002).

Dr. Hildebrandt does not bring forward any direct evidence of discrimination.[10] Under the indirect method,

---

[10] At oral argument, Dr. Hildebrandt's counsel appeared to argue that there was direct evidence of discrimination because "Mr. Little specifically told [the] EEO officer (Theresa Cummings), 'I will never give Ms. Hildebrandt more than an acceptable evaluation.'" This statement does not constitute "direct evidence." Direct evidence is "evidence that establishes [a fact] without resort to inferences from circumstantial evidence." *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir.), *cert. denied*, 537 U.S. 879 (2002). Assuming Mr. Little made the statement as quoted at oral argument, his rationale still could have been a permissible one under the statute. For instance, such a statement does not preclude the possibility that Mr. Little's grading decision was based on her performance or her inability to get along with others rather than gender. Counsel for Dr. Hildebrandt noted that there was evidence that Dr. Hildebrandt's work was satisfactory and apparently excellent. But such evidence in combination with Mr. Little's alleged statement

(continued...)

a plaintiff must establish a *prima facie* case of discrimination. Once she has done so, the employer must then produce a nondiscriminatory reason for the employment action. If the employer does so, the plaintiff must then present sufficient evidence that would enable a trier of fact to find that the explanation is pretextual.

---

[10] (...continued)
would create only an inference of discrimination, which would be indirect rather than direct evidence.

More problematic, Mr. Little's statement to Cummings is not readily found in the record. Dr. Hildebrandt's counsel provides a citation to the record for this statement; she cites to Ex.6, Cummings Dep., Plaintiff's Dep. Exs.27-34. Ex.6 is Cummings' deposition. On pages 40-44 of her deposition, Cummings reviewed and explained the contents of deposition exhibits 27-34. These exhibits are copies of "a questionnaire that [Cummings] gave to the staff" who worked with Dr. Hildebrandt when Cummings was investigating Dr. Hildebrandt's allegations of discrimination. Ex.6 at 40. None of the questionnaires can be identified by name. Nor could Cummings identify who wrote which one. *See* Ex.6 at 40-41. None of them state that Dr. Hildebrandt never would get more than an acceptable evaluation.

Through a meticulous search of the record, we have found something as near as we can to Mr. Little's alleged statement. In Plaintiff's Ex.40, Dr. Hildebrandt wrote to Mr. Little when objecting to one of her evaluations that "[y]ou once made the comment that I would never get above the middle evaluation range, at least not for a long time. . . . I believe this statement to be an unfair reality." However, this statement is written in response to her 1998 evaluation. In 1997, 1998 and 1999, Dr. Hildebrandt received a rating of "accomplished," the same rating as that given her male coworkers. Thus, her contention at oral argument and in her brief that Mr. Little said she would never get a rating above "acceptable," even if true, is contradicted by the fact that she did in fact get a rating over "acceptable" for fiscal years 1997, 1998 and 1999. Reply Br. at 13.

*Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002). Thus, we must first determine whether or not Dr. Hildebrandt has established a prima facie case. In order to establish a prima facie case for gender discrimination, the plaintiff must demonstrate that: "(1) she is a member of a protected class; (2) she was performing her job to her employer's legitimate expectations; (3) that in spite of her meeting the legitimate expectations of her employer, she suffered an adverse employment action; and (4) that she was treated less favorably than similarly situated male employees." *Markel v. Bd. of Regents of the Univ. of Wisconsin Sys.*, 276 F.3d 906, 911 (7th Cir. 2002).

Our examination of the record reveals that Dr. Hildebrandt has established a prima facie case that the 1997 raise, reflected in each of her paychecks received after July 10, 1997, constituted intentional discrimination. Dr. Hildebrandt has shown each of the required elements of a prima facie case: (1) She is a member of a protected class; (2) in 1997 she was performing her job to her employer's legitimate expectations as evidenced in her evaluation in 1997 as "accomplished," Defendant's Ex.38; (3) she suffered an adverse employment action, namely a paycheck reflecting her 1997 salary which was determined with a lower raise than that given her coworkers (*see Herrnreiter v. Chi. Hous. Auth*, 315 F.3d 742, 744 (7th Cir. 2002) (stating that actionable adverse employment actions include "[c]ases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished")); and (4) she was treated less favorably by receiving a lower raise than similarly situated male employees who were also rated as "accomplished." *See Markel*, 276 F.3d at 911. The record is unclear as to whether the IDNR brought forth a legitimate non-discriminatory reason and, if so, whether Dr. Hildebrandt was able to rebut that reason as pretextual. But

the record at the very least indicates that a prima facie case exists.

### c. Necessity of Remand

However, the fact that Dr. Hildebrandt set forth a prima facie case of disparate pay under Title VII does not necessarily require us to remand this claim to the district court for further proceedings. Remand is only necessary if there is a possibility that Dr. Hildebrandt may recover something more for her Title VII disparate pay claim than she already has received for her Equal Pay Act claim. We consider this possibility below.

Under the Equal Pay Act, a plaintiff may recover back wages; she also may recover liquidated damages in the amount of double the backpay award for willful violations. Both "are compensatory in nature." *Broadus v. O.K. Indus., Inc.*, 226 F.3d 937, 943 (8th Cir. 2000). As explained by the Eighth Circuit in *Broadus*, "[l]iquidated damages . . . 'constitute [] compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages,' " *id.* (quoting *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945)); they are a " 'means of compensating employees for losses they might suffer by reason of not receiving their lawful wage at the time it was due,'" *id.* (quoting *Reich v. S. New England Telecomms.*, 121 F.3d 58, 70 n.4 (2d Cir. 1997)). Properly characterized, therefore, Dr. Hildebrandt recovered $25,000 in backpay and an additional $25,000 in additional compensatory damages on her Equal Pay Act

claim.[11]

The damage provisions of Title VII differ from those of the Equal Pay Act. Under Title VII, as originally enacted, a plaintiff may recover equitable relief in the form of backpay and reinstatement, or front pay in lieu of reinstatement. *See Williams v. Pharmacia, Inc.*, 137 F.3d 944, 951 (7th Cir. 1998). With the passage of the Civil Rights Act of 1991, a plaintiff also may recover compensatory damages "for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses" and punitive damages if the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1) & (3). However, punitive damages cannot be recovered against "a government, government agency or political subdivision." *Id.* (b)(1).

Comparing the recovery Dr. Hildebrandt received on her Equal Pay Act claim with the potential types of recovery under Title VII, we believe that there is at least a possibility of additional recovery should Dr. Hildebrandt prevail on her Title VII claim. As noted above, Dr. Hildebrandt already has recovered backpay and, therefore, is precluded from any further award of backpay. She also received a substantial compensatory award. Given our precedent, it would be difficult for Dr. Hildebrandt to make a showing that she was entitled to additional compensatory damages attributable only to her discriminatory pay. *See Webb v. City of Chester*, 813 F.2d 824, 837 n.4 (7th Cir. 1987) (documenting range of

---

[11] Although Dr. Hildebrandt also sought injunctive relief in the form of a salary adjustment, the district court determined that such relief was not available under the Equal Pay Act. *See* R.161 at 5-6. Dr. Hildebrandt does not appeal this ruling.

awards of $500 to $50,0000 for emotional distress damages due to loss of employment). Finally, as a matter of law, Dr. Hildebrandt cannot recover punitive damages against the IDNR, a government agency. *See Baker v. Runyon*, 114 F.3d 668 (7th Cir. 1997).

However, Dr. Hildebrandt has not recovered any front pay as a result of the Equal Pay Act violation; indeed, the district court explicitly ruled that such relief was not available under the Equal Pay Act. *See* R.161 at 5-6. Such relief is available under Title VII. *See Gumbhir v. Curators of the Univ. of Missouri*, 157 F.3d 1141, 1144 (8th Cir. 1998) (stating that "[i]t is often appropriate to grant a prospective salary adjustment, or some other form of 'front pay,' in an employment discrimination case" and upholding a jury's front pay award to compensate for discrimination in the form of "below average salary increases"); *see also Kim v. Nash Finch Co.*, 123 F.3d 1046, 1066 (8th Cir. 1997) (upholding an award of front pay in failure to promote case). Consequently, because there is at least one type of relief available to Dr. Hildebrandt under Title VII that was not available to her under the Equal Pay Act, we must remand Dr. Hildebrandt's Title VII disparate pay claim for further proceedings.[12]

---

[12] We note, however, that front pay is an equitable remedy, *see Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 499 (7th Cir. 2000), and the decision to award or deny front pay is a matter of discretion for the district court, *see Sellers v. Delgado Coll.*, 902 F.2d 1189, 1193 (5th Cir. 1990). We express no opinion on whether the district court should award front pay or, more fundamentally, whether Dr. Hildebrandt's underlying Title VII claim is meritorious.

### 2. Title VII—Hostile Environment

#### a. Statute of Limitations

With respect to Dr. Hildebrandt's hostile work environment claim, we believe that *Morgan* requires that we conclude that the district court erred in limiting its review of her claim to acts occurring after July 10, 1997. Under *Morgan*, "[a] hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Morgan*, 122 S. Ct. at 2074. Consequently, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* Because Dr. Hildebrandt alleges several acts as part of her hostile work environment claim that arose after July 10, 1997, she can reach beyond the limitations period to bring forth evidence of facts prior to that time that contributed to the hostile environment.

However, a court of appeals can affirm a district court's grant of summary judgment on any ground that finds support in the record. *See Conley v. Vill. of Bedford Park*, 215 F.3d 703, 709 (7th Cir. 2000). As explained in greater detail below, we do not believe that Dr. Hildebrandt has set forth a prima facie case of hostile work environment sexual harassment, and we affirm the district court's judgment on that basis.

#### b. Merits

"An employer violates Title VII when discrimination based on sex . . . create[s] a hostile or abusive work environment." *Adusumilli v. City of Chi.*, 164 F.3d 353, 361 (7th Cir. 1998) (internal quotation marks and citations omitted).

"Workplace harassment must be sufficiently severe or pervasive to be actionable." *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 692-93 (7th Cir. 2001) (internal quotation marks and citations omitted).[13] "Harassment is not limited to acts

---

[13] We note, at the outset, that none of the allegedly discriminatory actions that occurred after July 10, 1997, standing alone, constitute actionable adverse employment actions. We review these allegations briefly.

Dr. Hildebrandt first maintains that, in 1998, Mr. Little advised Dr. Hildebrandt that she would be subjected to quarterly evaluations, but did not have the same requirements for the male program administrators. All that Dr. Hildebrandt alleges is that Mr. Little "advised" her that she would be subject to quarterly or mid-year evaluations. Appellant's Br. at 15. The defendants admitted in their answer to the complaint that Mr. Little had so "advised." R.1 at ¶¶ 37-38; R.4 at ¶¶ 37-38; R.44 at ¶¶ 37-38. However, the record appears to be devoid of any evidence indicating that Dr. Hildebrandt was ever subjected to a quarterly or mid-year evaluation.

Second, Dr. Hildebrandt points to two other aspects of her review process that she believes were discriminatory—the fact that David Gillespie sat in on her evaluations after 1998 and that her male coworkers were evaluated only by Mr. Little and that, during her 1998 performance evaluation, Mr. Little recommended that she travel less, apparently explaining that she might spend more time with her family.

Under our case law, it is clear that the above acts do not constitute an adverse employment action.

> We have defined an adverse employment action as "more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly dimin-

(continued...)

[13] (...continued)
> ished material responsibilities, or other indices that might be unique to a particular situation.

*Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002) (quoting *Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996)); *see also Markel*, 276 F.3d at 911 (finding that being "denied 'better' equipment, the ability to travel and make presentations, and removed from certain accounts that caused her not to receive bonuses" did not constitute adverse employment actions). Adverse employment actions do not include inconveniences or minor events that "make[] an employee unhappy." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). By contrast, "an employee must show that 'material harm has resulted from . . . the challenged actions.'" *Traylor*, 295 F.3d at 788 (quoting *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 692 (7th Cir. 2001)).

Turning to Dr. Hildebrandt's allegations, we cannot conclude that the alleged discriminatory actions constitute adverse employment actions. The fact that Gillespie sat in on the evaluations and that Mr. Little *advised* Dr. Hildebrandt that she would have extra performance evaluations (there is no evidence he ever implemented this advisement), particularly when she received favorable evaluations under these conditions, cannot constitute an adverse employment action. Certainly there may be situations when a difference in the frequency and quality of evaluations may constitute an adverse employment action, *see, e.g., Hernandez v. Hill Country Tel. Cooperative*, 849 F.2d 139, 143 (5th Cir. 1988) (finding discrimination on the basis of race when, among other inequities, the plaintiff was limited to annual raises and the other employees received pay raises on a semi-annual basis); however, this is not such a case.

Furthermore, we note that beginning with her annual performance evaluation in 1998, Dr. Hildebrandt was given the same performance evaluation of "accomplished" and the same percentage raise as her male coworkers. *See* Defendant's Ex.38.

(continued...)

of sexual desire, but rather is a broad term which encompasses all forms of conduct that unreasonably interfere with an individual's work performance or create an intimidating, hostile, or offensive working environment." *Id.* at 692 (internal quotation marks and citations omitted). Yet, "not all workplace conduct that may be described as 'harassment' affects a term, condition, or privilege of employment within the meaning of Title VII." *Adusumilli*, 164 F.3d at 361. Thus, "[t]o prevail on a hostile environment claim, the plaintiff must show that the work environment was both subjectively and objectively hostile." *Haugerud*, 259 F.3d at 692-93. "An objectively hostile environment is one that a reasonable person would find hostile or abusive," and a court "must consider all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Adusumilli*, 164 F.3d at 361 (internal quotation marks and citations omitted). Finally, and significantly in this case, the harassment must have "occurred because of the sex of the complainant, thus we ask whether she was exposed to disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed." *Haugerud*, 259 F.3d at 692.

We now shall examine Dr. Hildebrandt's primary factual allegations in light of our hostile work environment case

---

[13] (...continued)

Consequently, Dr. Hildebrandt did not suffer a material harm as a result of the alleged actions.

law.[14]

---

[14] Dr. Hildebrandt also alleges multiple acts of discrimination that we do not discuss in the body of the opinion. By way of example only, Dr. Hildebrandt argues (1) that Gillespie once removed a reference to the fact she had a Ph.D. from one urban forestry program; (2) that the IDNR telephone directories for a time omitted listings for various urban forestry programs; (3) that Sester had a full-time secretary, but that the other three (herself and two men) shared the services of Ms. Brown and the clerical staff; (4) that Ms. Brown and Mr. Little made stylistic changes to her letters without her consent, such as that Mr. Little changed the wording of a letter Dr. Hildebrandt wrote from "Illinois Department of Natural Resources" to "we," R.80 Supplemental Aff. of Hildebrandt at ¶ 17; Dr. Hildebrandt was so upset at this change by her supervisor—because it was her "opinion that a more formal identifier be used for the Department"—that she discussed it with Mr. Pequignot, who agreed with Mr. Little, *see id.*; (5) that she was denied computer equipment; Dr. Hildebrandt always had a computer, though initially she had a 286, and was later given a 386, which is the same computer the other program administrators were given, *see* Hildebrandt Dep. 62-65; (6) that Ms. Brown and others who accompanied Dr. Hildebrandt to conferences refused to help Dr. Hildebrandt in setting up and taking down displays, *see* Hildebrandt Dep. 103-06; (7) that Dr. Hildebrandt was treated disrespectfully by Ms. Brown and staff workers, particularly that they treated her coldly while treating the men more warmly. With respect to this last allegation, Dr. Hildebrandt does not give any specific examples of either the cold or the warm treatment, except that she was yelled at by staff on a particular occasion; however, the record indicates that Sester also had altercations with his secretary, Robin Blue, *see* Hildebrandt Dep. at 57; Sester Dep. at 108; Defendant's Ex.8A (Little Dep.) at 170 (explaining that Sester had "major blowups" with staff).

(continued...)

First, Dr. Hildebrandt argues that she was subject to "[o]ne or two off-color remarks made in her presence." Appellant's Br. at 9. Dr. Hildebrandt does not elaborate on those remarks, but the record indicates that there were two distasteful jokes made by coworkers, neither of which were directed at or told to Dr. Hildebrandt—she only overheard them. We have recognized that "simple teasing" and "offhand comments" generally "will not amount to discriminatory changes in the terms and conditions of employment." *Adusumilli*, 164 F.3d at 361 (internal quotation marks omitted). Moreover, "second-hand harassment," that is, comments not directed to the plaintiff, do not have the same impact as "harassment directed at the plaintiff." *Id.* at 362.

Second, Dr. Hildebrandt argues that Mr. Little required Dr. Hildebrandt "to submit monthly goals," while her male

---

[14] (...continued)

Although we do not dispute that such incidents, if properly supported in the record and if affecting the plaintiff disproportionately in comparison to her male counterparts, may contribute to a hostile work environment, neither of these requirements is satisfied here. Apart from the complete lack of citation to the record for any of these assertions, Dr. Hildebrandt has failed to demonstrate that she was subjected to this treatment on the basis of her sex. The record simply does not support a conclusion that male program administrators were treated more favorably on these matters. In fact, Dr. Hildebrandt admits that for several of the alleged harassing acts (the signing of letters by Ms. Brown and the sharing of secretaries), men and women were treated the same. Consequently, because many of these allegations are not supported by proper citation to the record and because Dr. Hildebrandt has not shown that she was treated differently from her male coworkers with respect to these events, we do not consider these events in assessing Dr. Hildebrandt's claim of a hostile work environment.

counterparts were not subject to the same requirement. Appellant's Br. at 10. The record does not support this contention. Mr. Little explained in his deposition that each of the program administrators was required to submit monthly accomplishment statements. Each program administrator had his own way of doing so; some filed very informal monthly statements. *See* Defendant's Ex.8B at 353-54. Dr. Hildebrandt argues that she additionally was required to state her future goals as well as her accomplishments. She brought as evidence of this requirement two such monthly goal statements that she had submitted to Mr. Little in 1993. Plaintiff's Exs.198 & 199. At most, viewing the evidence in the light most favorable to Dr. Hildebrandt, the record indicates that Dr. Hildebrandt had the extra burden of including her future "goals" in her monthly statement of accomplishments, although the statement itself was a requirement for all program administrators, male and female. *See* Defendant's Ex.8B at 354.

Third, Dr. Hildebrandt noted that Mr. Little advised Dr. Hildebrandt that she would be subject to quarterly reviews after 1998, but, apparently, did not similarly advise the male program administrators. *See* R.1 at ¶¶ 37-38; R.44 at ¶¶ 37-38.

Fourth, Dr. Hildebrandt notes that Gillespie sat in on her evaluations after 1998 and that her male coworkers were evaluated only by Mr. Little.

Fifth, Dr. Hildebrandt alleges that she was not allowed to communicate directly with district foresters, but instead was forced to communicate with them through Gillespie and that the male program administrators were not subject to the same requirement. However, the evidence demonstrates that the male program administrators were required to speak through Gillespie on specified projects with the district foresters. *See* R.80 Supplemental Aff. of Hildebrandt

at ¶ 54. At most, looking at the evidence in the light most favorable to Dr. Hildebrandt, she was required to go through Gillespie on more projects than were the men, but the men were also required to do so, at least on occasion.

Dr. Hildebrandt has failed to show that these acts constitute an objectively hostile work environment. "Harassment, in the context of Title VII, involves conduct that unreasonably interferes with a person's work performance or creates an intimidating, hostile, or offensive work environment." *Ngeunjuntr v. Metro. Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998). The enumerated acts alleged by Dr. Hildebrandt at most inconvenienced her, and there is no evidence that any of them "unreasonably interfere[d]" with her work. *Id.*

In addition to the allegations just analyzed, Dr. Hildebrandt makes several general allegations of unequal treatment. She claims that Ms. Brown and Mr. Little bottlenecked her work and that Ms. Brown gave Dr. Hildebrandt's work lower priority;[15] that "the level of her staff support since 1991 has been diminished by over 50%";[16] and that she was not allowed to work with interns as extensively as the men.[17] However, these "[b]are allegations not supported by specific facts are insufficient in

---

[15] In her deposition, Dr. Hildebrandt stated that she has generally observed that it takes longer for the support staff to complete her work than it does to complete work for the men, but again, she brings forth no specific instances of such. *See* Hildebrandt Dep. at 58-59.

[16] We were unable to find this statistic in the record or any factual support for it.

[17] The record shows that Dr. Hildebrandt did have interns work for her from time to time. Dr. Hildebrandt has failed to bring forth any specific evidence of what interns were available to Urban Forestry or the other programs or of the procedure for hiring and assigning interns.

opposing a motion for summary judgment." *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989); *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) ("Conclusory allegations, unsupported by specific facts, will not suffice.").

## C. Section 1983 Claims

Dr. Hildebrandt also brought § 1983 claims, parallel to her Title VII claims, against the individual defendants for sex discrimination with respect to her compensation and with respect to non-compensatory inequitable treatment.[18]

### 1. Section 1983/Non-compensatory Claims

The district court dismissed the § 1983 claims concerning

---

[18] The Supreme Court's ruling in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), although discussing the continuing violation doctrine in the Title VII context, applies equally to § 1983 cases. *See Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003) (explaining the lack of a "principled basis upon which to restrict *Morgan* to Title VII claims" and thus applying it to § 1983 claims), *petition for cert. filed*, 72 U.S.L.W. 3093 (July 9, 2003); *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1058-61 (9th Cir. 2002) (applying *Morgan* to § 1983 claims). Therefore, under *Morgan*, any discrete acts that Dr. Hildebrandt alleges occurred outside of the limitations period for § 1983 actions are barred, but acts that contribute to a hostile work environment may be considered so long as one of the contributing acts occurred within the limitations period. The statute of limitations for § 1983 actions in Illinois is two years, *see Licari v. City of Chi.*, 298 F.3d 664, 667-68 (7th Cir. 2002), and Dr. Hildebrandt filed her case on December 29, 1998. Consequently, we focus our inquiry on events that occurred after December 29, 1996.

the treatment of Dr. Hildebrandt unrelated to her compensation on the basis that the defendants were entitled to qualified immunity. We begin by noting that the district court did not employ the methodology set forth by the Court in *Saucier v. Katz*, 533 U.S. 194 (2001), to determine whether the defendants were entitled to qualified immunity. According to *Saucier*, the district court was required to analyze first whether there was a constitutional violation and second whether it was clearly established, at the time the defendants took the allegedly discriminatory actions, that such actions violated the Constitution. The district court incorrectly skipped the first step and rather first inquired whether there was qualified immunity. Here, we follow *Saucier* and inquire first whether the actions of each defendant resulted in a constitutional violation.

"[T]he same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection" claims. *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003). Thus, the non-compensatory § 1983 claims against the individual defendants can be dismissed on the same basis as the Title VII claims: Dr. Hildebrandt has failed to set forth a prima facie case of discriminatory treatment or of hostile work environment harassment.[19]

---

[19] For the disparate treatment discrete action claim (not the hostile work environment claim), the statute of limitations for § 1983 claims bars any discrete actions occurring before December 29, 1996, while the statute of limitations for Title VII barred any actions occurring before July 10, 1997. Thus, if Dr. Hildebrandt had alleged any specific actions that fell between those dates, we would have to review them separately here. However, Dr. Hildebrandt did not allege any specific actions that fell between December 29, 1996, and July 10, 1997.

## 2. Section 1983/Disparate Pay Claims

As to her disparate pay claim, the only raise that Dr. Hildebrandt received at a discriminatory rate after December 29, 1996, was her July 1, 1997 raise. The district court granted summary judgment to all of the individual defendants (Mr. Pequignot, Ms. Brown and Mr. Cottrell) except Mr. Little on the basis that Mr. Little "was the only Defendant who directly participated in this possibly discriminatory act" and "[s]ection 1983 requires direct participation." R.81 at 19. The district court later entered a directed verdict in favor of Mr. Little on this claim because Dr. Hildebrandt had failed to show intent to discriminate and because Mr. Little was entitled to qualified immunity. She appeals the judgment in favor of Mr. Pequignot and Mr. Cottrell, as well as the directed verdict in favor of Mr. Little.

We first address the claim against Mr. Little.

### a. Directed Verdict for Mr. Little

The district court appears to have concluded that Dr. Hildebrandt failed to show that Mr. Little possessed the necessary discriminatory intent required to set forth an equal protection claim. At trial, Dr. Hildebrandt testified that her 1997 evaluation was not a bad evaluation.[20] The

---

[20] Dr. Hildebrandt's statement at trial was part of the following dialogue concerning the 1997 performance evaluation:

> Q. How many "accomplished" did you get?

> A. Five.

> Q. And in fact, on Page 4 of this evaluation, Dick Little rated

(continued...)

district court concluded that this testimony and the fact that Mr. Little gave raises that were within the suggested guideline range demonstrated that "Little did not intentionally give [Dr. Hildebrandt] a smaller raise in that year because of her gender." R.155 at 684.

We do not believe that the district court's conclusion necessarily follows from the facts upon which it relied. If Mr. Little gave Dr. Hildebrandt the lowest raise in a range because of her sex, but gave all the men who were similarly evaluated higher raises, Mr. Little's actions would constitute intentional discrimination regardless of whether he followed the guidelines and of whether "accomplished" is considered a good or bad rating.

With respect to Mr. Little's intent, Dr. Hildebrandt was not required to rely upon direct evidence. As explained in *Bruno v. City of Crown Point*, 950 F.2d 355, 361 (7th Cir. 1992), "[u]nder Title VII and § 1983, the plaintiff is required to establish that she has been the victim of intentional discrimination." Yet, for both § 1983 and Title VII claims, "[t]he plaintiff can provide evidence of intentional discrimination in two different ways. The plaintiff may either offer direct proof of discrimination or may rely on indirect evidence

---

[20] (...continued)

> you with respect to your human relations as "accomplished," and he made a positive comment; "Reinee continues to improve in this area." Right?
>
> A. Correct.
>
> Q. Did you think this was a bad evaluation?
>
> A. No.

R.105 at 44. With respect to the various categories listed on the evaluation form, Dr. Hildebrandt received five ratings of "accomplished" and four ratings of "acceptable." Her overall rating on the 1997 review was "accomplished."

using the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting method of proof." *Id.* (internal citations omitted).

Because Dr. Hildebrandt did not bring forth direct evidence of discrimination with respect to her 1997 raise, we must determine whether she established the requisite intent through circumstantial evidence. As *Bruno* notes, the most common method of establishing intent in the absence of direct evidence is the *McDonnell-Douglas* indirect method outlined above. First, Dr. Hildebrandt was in a protected class as a woman; second, she received an evaluation of "accomplished" for 1997 and was meeting her employer's legitimate employment expectations; third, she suffered an adverse employment action, namely, a raise at a discriminatory rate; and fourth, she was treated differently from similarly situated employees in that two of the male program directors received the same employment evaluation that Dr. Hildebrandt received and both received higher raises. The exact percentages of the raises are disputed, but Dr. Hildebrandt received either a 3.55% or a 3.56% raise; Schmocker received either a 4% or a 4.4% raise; and Skuba received a 6% or a 7.8% raise.

Because the district court never reached the merits of this claim, it never had an opportunity to address whether Dr. Hildebrandt was subject to disparate treatment on an impermissible basis. On remand,[21] the court will have to determine whether Mr. Little gave a neutral reason for the lower raise and whether Dr. Hildebrandt showed that any

---

[21] Unlike her claim under Title VII, Dr. Hildebrandt's § 1983 claim may result in an award of punitive damages against the individual defendants. *See, e.g., Siebert v. Severino*, 256 F.3d 648 (7th Cir. 2001).

such reason was pretextual.[22]

---

[22] Because there are genuine issues of material fact with respect to whether a constitutional violation took place, we also cannot resolve the second issue of the *Saucier* analysis—whether the defendants are entitled to qualified immunity—on the record before us. We have stated that qualified immunity shields a governmental official from § 1983 liability if "*either* the federal law he is asserted to have breached was not clearly established at the time of the alleged violation or there exists no genuine dispute of material fact which would prevent a finding that his actions, with respect to following such clearly established law, were objectively reasonable." *Tangwall v. Stuckey*, 135 F.3d 510, 515 (7th Cir. 1998). With respect to the first part of this inquiry, we note that the district court erred in requiring the plaintiff to come forward with a case precisely on point in order to show that the right was clearly established. We previously have explained that

> [a] right is clearly established when its contours are suffi-
> ciently clear so that a reasonable official would realize that
> what he is doing violates that right. This does not mean that
> there has to be a case on point holding that the officials' exact
> conduct is illegal before we will find the officials liable;
> however, in the light of preexisting law the unlawfulness
> must be apparent.

*Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997) (internal quotation marks and citations omitted). Consequently, the fact that Dr. Hildebrandt cannot point to a case holding "that giving a lower raise that was within the set guidelines" resulted in a constitutional violation, Trial Tr. at 684, is not dispositive of the qualified immunity issue. *See, e.g., Nabozny v. Podlesny*, 92 F.3d 446, 455-56 (7th Cir. 1996) (holding that defendants were not entitled to qualified immunity on a claim of gender discrimination even though there were no cases directly on point because the Supreme Court in 1971 had established that the Equal Protection

(continued...)

### b. Personal Involvement of Mr. Pequignot and Mr. Cottrell

Having determined that Dr. Hildebrandt established a prima facie case that the 1997 raise constituted intentional gender discrimination, we turn to whether Mr. Pequignot and Mr. Cottrell also could be subject to liability for the allegedly discriminatory 1997 raise. The district court dismissed Mr. Pequignot and Mr. Cottrell because they were not personally involved in the raise.

For a defendant to be liable under § 1983, he or she must have participated directly in the constitutional violation. "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). For supervisors,

> [a]n official satisfies the personal responsibility requirement of section 1983 . . . if the conduct causing the constitutional deprivation occurs at [his] direction or

---

[22] (...continued)

Clause "prevent[ed] arbitrary gender-based discrimination" and by 1982 the Supreme Court had held that the Equal Protection Clause "requir[ed] equal treatment regardless of gender"); *Markham v. White*, 172 F.3d 486, 491 (7th Cir. 1999) ("The fact that arbitrary gender-based discrimination, including discrimination in an educational setting, violates the equal protection clause has been plain in this circuit for almost a decade and a half.").

Furthermore, as explained in detail above, there is a genuine issue of material fact that precludes a finding that Mr. Little did not discriminate against Dr. Hildebrandt on the basis of her sex by giving her a lower raise within the guideline range. Consequently, summary judgment on qualified immunity grounds is not appropriate.

with [his] knowledge and consent. That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye. In short, some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery.

*Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (internal quotation marks and citations omitted). Mr. Little was Dr. Hildebrandt's direct supervisor, Mr. Pequignot supervised Mr. Little, and Mr. Cottrell supervised Mr. Pequignot.

At oral argument and in her brief, Dr. Hildebrandt stressed that there was evidence that Mr. Pequignot was involved directly with Dr. Hildebrandt's performance evaluations and accompanying raises. The record supports this contention. In his deposition, Mr. Little stated that he "always discussed every one of these [performance evaluations and raises] with the State Forester [Mr. Pequignot]." Defendant's Ex.8B at 248. Although Mr. Pequignot testified that he reviewed the raises merely to determine if they fit within the budget, *see, e.g.*, Defendants' Ex.7A at 32, Mr. Pequignot also stated that in "a lot" of cases Mr. Little would bring the evaluations to him to review or see if Mr. Pequignot had any comments or changes. Defendants' Ex.7A at 32. Indeed, the record includes a memo from Mr. Little to Mr. Pequignot requesting comments on Dr. Hildebrandt's 1993 performance evaluations (we have no information specifically concerning the 1997 evaluation and raise, except that Mr. Pequignot signed it as well as the evaluations and raises for the male program administrators). *See* Defendants' Exs.15-18. Viewing the evidence in the light most favorable to Dr. Hildebrandt, as we must on summary judgment, we conclude that there is a genuine issue of material fact as to whether the alleged "constitutional deprivation occur[red] . . . with [Mr. Pequignot's] knowl-

edge and consent." *Gentry*, 65 F.3d at 561. There is at least a genuine issue of fact that Mr. Pequignot "kn[ew] about the conduct, facilitat[ed] it, approve[d] it, [and] condone[d] it," as evidenced by his participation in the evaluation process as well as his signing (and approving) the evaluations. *Id.* We therefore reverse the district court's determination as to Mr. Pequignot.

However, we do not reach the same conclusion as to Mr. Cottrell. Dr. Hildebrandt's only allegation of personal involvement by Mr. Cottrell was that he "attended and actively participated in the March 31, 1998 meeting." Appellant's Br. at 35; R.73 at 5. We do not think that this allegation constitutes sufficient evidence to create a triable issue of fact for a jury that Mr. Cottrell was personally involved in determining Dr. Hildebrandt's 1997 raise. We accordingly affirm the district court as to its grant of summary judgment in favor of Mr. Cottrell.

### D. Cummings' Statements

At trial, Dr. Hildebrandt sought to testify that, during the March 31, 1998 meeting, Theresa Cummings had stated that Director Manning had "approved" Cummings' recommendations (to review Dr. Hildebrandt's salary, etc.). The defendants objected to Dr. Hildebrandt's statement as hearsay, and the trial court sustained the objection. The trial court stated that Cummings would have to be called as a witness and testify herself as to whether or not Manning approved her recommendations and what her recommendations were. *See* R.110 at 183, 187.

"Evidentiary rulings by the trial judge are reviewed for an abuse of discretion, and we will alter the district court's ruling only if failure to do so would be inconsistent with substantial justice." *Fort v. C. W. Keller Trucking, Inc.*, 330

F.3d 1006, 1013 (7th Cir. 2003) (internal quotation marks and citations omitted); *see also* Fed. R. Civ. P. 61 ("No error in either the admission or the exclusion of evidence . . . is ground for . . . modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").

Here, it appears that any error with regard to admitting Cummings' statements or documents was harmless. With respect to Cummings' recommendations, no harm resulted from the ruling because the recommendations were read into the record. *See* R.153 at 305-06 (Cummings reads her recommendations into the record); R.154 at 543-44 (court noting that the inadmissible letter repeated that to which Cummings had already testified). As to the district court's refusal to allow Dr. Hildebrandt to testify that Cummings stated to her (Dr. Hildebrandt) that Director Manning had "approved" Cummings' recommendation, the issue is irrelevant to the claims being appealed. Dr. Hildebrandt prevailed at trial on her Equal Pay Act claim. She claims in her reply brief that Cummings' excluded "statements are evidence of intentional discrimination on the parts of Little, Pequignot, and Cottrell for both the 1983 claims and the Title VII claims." Reply Br. at 16. However, the § 1983 claims against Mr. Pequignot and Mr. Cottrell were disposed of on summary judgment, as were the Title VII claims. In evaluating the propriety of summary judgment on appeal, we are limited to reviewing what the district court had before it at the time it granted summary judgment, *see, e.g., Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 242 (4th Cir. 2002); such evidence does not include trial testimony. Consequently, the district court's evidentiary rulings during

trial do not provide a basis for overturning a summary judgment.

The only claim potentially affected by the court's evidentiary ruling is the § 1983 claim against Mr. Little. However, whether Director Manning approved Cummings' recommendations in 1998 is irrelevant to the question of whether Mr. Little acted with discriminatory intent in giving a lower raise to Dr. Hildebrandt in July of 1997. Reversible error cannot be predicated on the decision to allow, or refusal to admit, evidence that is not probative of an issue before the court. *See Old Republic Ins. Co. v. Employers Reinsurance Corp.,* 144 F.3d 1077, 1081 (7th Cir. 1998) (stating that "[n]o error in either the admission or the exclusion of evidence . . . is ground for granting a new trial or for . . . disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice" and further stating that this standard is met "when a significant chance exists that they affected the outcome of the trial" (internal quotation marks and citations omitted)). Thus, the district court's refusal to admit Cummings' statement at trial, even if error, also was harmless with respect to the disparate pay claim against Mr. Little.

### E. Attorneys' Fees

The district court reduced Dr. Hildebrandt's fees by one-third on the basis of her limited success. Dr. Hildebrandt submits that the district court erred in this determination. However, we need not reach this precise issue. Our reversal of the district court with respect to the Title VII disparate pay claim and to the § 1983 claims against Mr. Little and Mr. Pequignot potentially changes Dr. Hildebrandt's degree of success. We therefore vacate the district court's attorneys' fee award.

## Conclusion

The judgment of the district court is affirmed with respect to its grant of summary judgment to the individual defendants on the non-compensatory § 1983 claims and to the IDNR on the non-compensatory Title VII claim. However, we reverse the judgment of the district court with respect to the § 1983 disparate pay claims against Mr. Little and Mr. Pequignot, and with respect to the Title VII disparate pay claim against the IDNR, and we remand these claims for further proceedings. Finally, because our ruling may alter the measure of Dr. Hildebrandt's success on the merits, we vacate the district court's grant of attorneys' fees. The parties shall bear their own costs in this court.

AFFIRMED in part, REVERSED in part,
VACATED in part and REMANDED

A true Copy:

      Teste:

                            _____

                            *Clerk of the United States Court of*
                            *Appeals for the Seventh Circuit*